**JANOVE PLLC**
Raphael Janove (*pro hac vice* forthcoming)
raphael@janove.law
500 7th Avenue, 8th Fl.
New York, NY 10018
Telephone: (646) 347-3940

**JANOVE PLLC**
Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

***Attorneys for Plaintiffs and the Proposed Class***

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CHERYLL DOUGHERTY, DELIA CAMARGO, and LAWRENCE GARCIA, individually, as private attorneys general, and on behalf of all others similarly situated,

Plaintiffs,

v.

ZYNGA INC.,

Defendant.

Case No. 3:25-cv-04051

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

Plaintiffs Cheryll Dougherty, Delia Camargo, and Lawrence Garcia ("Plaintiffs"), individually, as private attorneys general, and on behalf of all others similarly situated, bring this class action suit for damages and equitable relief against Zynga, Inc. ("Zynga" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, and on their own investigation, on the investigation of their counsel, or on information and belief as to all other allegations:

## NATURE OF THE ACTION

1. This is a class action on behalf of mobile video game players who Zynga subjected to deceptive business practices designed to manipulate players into spending large sums of money on in-game purchases.

2. Toon Blast and Toy Blast (together, the "Games") are two nearly identical, highly popular mobile games published by Defendant Zynga Inc., a subsidiary of Take-Two Interactive Software, Inc. ("Take-Two"), a multibillion-dollar powerhouse in video game publishing.

3. The Games are marketed as free to play but are structured to pressure players into making in-game purchases to continue playing or advance through the Games' levels.

4. Players of the Games are constantly bombarded with materially false and misleading offers for in-game purchases. These offers depend on false discounting and manipulative presentation, archetypal examples of "dark patterns"—manipulative design practices the Federal Trade Commission ("FTC") identified in its September 2022 report, "Bringing Dark Patterns to Light."[1]

5. For instance, the Games consistently, and falsely, advertise massive purported discounts on in-app purchases, such as "70% off" or "90% off." In truth, these products are always sold at the "sale" or discounted price and never at the purported reference price. Defendant uses these false discounts to artificially inflate reasonable consumers' perception of the values of in-game goods, create an illusion of savings, and trick players into spending more than they otherwise would have.

[1] FTC Staff Report, Bringing Dark Patterns to Light (Sept. 14, 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

6. Defendant further pressures players into making purchasing decisions by displaying fake countdown timers for these "sales," creating an illusion of scarcity based on the idea there is a limited amount of time to purchase the product "on sale" and get the discount.

7. The Games themselves are designed to be addictive, constantly stimulating the brain's reward centers in the same manner as slot machines. The false discounting and countdown timers leverage the addictive nature of the Games by targeting players with special discount offers at the times and in the manner that Defendant's patented technologies predict will make players most susceptible to falling victim to their dark pattern tactics.

8. On information and belief, the Games bring Zynga revenue of more than $1 million per day and have brought in more than $1 billion since their launch.

9. By implementing and maintaining the Games' false and deceptive marketing, advertising, and pricing schemes, Zynga has violated California law prohibiting misleading statements about the existence and amount of price reductions. The claims and issues asserted herein are governed by California state law because California is the state from which Defendant's alleged misconduct and false statements emanated. The State of California has the greatest interest in policing corporate conduct occurring within the State.

10. In addition, Zynga violates the Video Privacy Protection Act ("VPPA") by willfully sharing and disclosing to third parties the personal identifying information and video viewing histories of users of its many mobile games, without first obtaining consent in the manner the VPPA requires. Zynga makes enormous profits from its marketing partners by offering targeted advertising and showing video advertisements to its players, including Plaintiff Garcia.

11. Plaintiffs, individually, as private attorneys general, and on behalf of all others similarly situated, hereby seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

**PARTIES**

12. Plaintiff Cheryll Dougherty is a natural person and a California resident.

13. Plaintiff Delia Camargo is a natural person and a California resident.

14. Plaintiff Lawrence Garcia is a natural person and until August 2024 was a California

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

resident. Plaintiff Garcia made in-app purchases in the Toon Blast game as a California resident. Plaintiff Garcia also watched pre-recorded video content in the Toon Blast game.

15. Because of Defendant's false and misleading advertising and sales tactics, and intentionally addicting game design, all Plaintiffs made in-app purchases in the Games at higher prices and at higher frequencies than they otherwise would have. These in-app purchases included items or packs that were falsely advertised as on limited-time sales or discounted, as illustrated below.

16. Defendant Zynga Inc. ("Zynga") is a Delaware corporation with its principal place of business at 1200 Park Place, San Mateo, CA 94403.

17. At all times relevant herein Defendant conducted business in the State of California, in the County of San Mateo, within this judicial district.

**JURISDICTION & VENUE**

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, and under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Classes exceeds 100; and many members of the proposed Classes are citizens of different states than Defendant.

19. This Court has personal jurisdiction over Defendant because it is headquartered in San Mateo, California and because a substantial portion of the events and conduct giving rise to Plaintiffs' claims occurred in California.

20. Zynga was founded in San Francisco, CA, in 2007.[2]

[Space is intentionally left blank]

[2] https://www.zynga.com/about/our-story/

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

21. As of September 2022, when Zynga moved its headquarters from San Francisco[3] and opened its current headquarters in San Mateo, CA, Zynga had "almost 300 employees based in the Bay Area."[4] The image below shows Zynga's San Mateo headquarters. The digital art on the left wall depicts the tile-matching gameboard from the Games.




22. Upon information and belief, key figures in Zynga's corporate hierarchy and leadership team are located in California,[5] including President Frank Gibeau, Chief Product Officer Scott Koenigsberg, Chief Operating Officer / Chief Financial Officer Tanner Logue, former President of Publishing Bernard Kim (including when Zynga purchased the Games), Zynga founder and current Executive Chairman of the Board Mark Pincus,[6] Executive Vice President of Mobile Studios Yaron Levyand, and Vice President of Global Brand Sales & Partnerships, Gabrielle Heyman.

23. In July 2020, "within a few years of Gibeau's tenure as CEO," Zynga acquired Peak Games, the original developer of the Games.[7] After acquiring the Games, Zynga's "leadership team

---

[3] https://www.sfgate.com/bayarea/article/Zynga-closing-sf-headquarters-subleasing-office-16374989.php

[4] https://www.zynga.com/blog/zynga-celebrates-opening-of-san-mateo-headquarters/.

[5] https://www.zynga.com/leadership/

[6] https://www.zynga.com/board-of-directors/mark-pincus/

[7] https://www.zynga.com/about/our-story/

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

. . . applied Zynga's world-class live operations and data analytics to turbocharge growth."[8] Zynga quickly set out to update the Games, adding new competitions and features, and updating Toy Blast's graphics to a "more modern look" within the first quarter of acquiring the Games.[9]

24. Zynga describes itself during "The Gibeau era" as "The world's fastest-growing mobile game company," and notes that "[u]nder Gibeau's leadership, Zynga doubled down on forever franchises, leveraging the company's excellence in data, analytics and live operations to grow existing games, acquire talented studios, and develop the next generation of mobile games."[10]

25. After Zynga became a subsidiary of Take-Two in 2022, "Zynga's highly skilled and proven management team, led by Frank Gibeau and . . . Bernard Kim," were charged with "driv[ing] the strategic direction for Take-Two's mobile efforts."[11]

26. According to LinkedIn, as of April 2025, Zynga has 589 employees in California.

27. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the Defendant resides in this district; and (ii) the conduct complained of herein occurred within this judicial district.

28. This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

**DIVISIONAL ASSIGNMENT**

29. Assignment to the San Francisco or the Oakland Division is proper under Civil Local Rules 3-2(c) and 3-2(e) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County.

[Space is intentionally left blank]

---

[8] *Id.*

[9] Zynga Q3 2020 Letter to Shareholders

[10] *Id.*

[11] https://www.zynga.com/blog/take-two-and-zynga-to-combine/

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**FACTUAL ALLEGATIONS**

30. The Games are "tile matching" games, similar to Candy Crush. To advance through a "level" of one of the Games, a player must repeatedly select groups of similar tiles. When a group of tiles is selected, as in the example below, it is removed from the game board.




31. Players must clear the game board in a certain number of "moves." Each successive level gets more difficult, as tiles appear in increasingly unfriendly configurations and the allotted number of moves a player gets to complete the level decreases.

32. If a player cannot beat a level, they lose a "life" and must start the level over.

33. The Games are functionally identical, for the purpose of this suit. Each has its own branding, but the gameplay and user experience take the same shape. And most importantly, Defendant employs identical deceptive business practices in both Games.

**I. The Games offer in-game purchases.**

34. The Games offer in-game purchases of digital items in three categories.

35. The first category includes items that allow players to play the game under modified conditions by suspending otherwise applicable rules, such as by allowing players to restart a level

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

without losing a life. Items in this category are typically named for their purpose. For example, the "infinity heart" allows a player to continue playing levels without regard for their allotted lives (i.e. without losing a life when they cannot beat a level) until a timer runs out.

36. The second category includes items that directly assist players in defeating a level. These items might confer (i) the right to make extra moves, or (ii) the ability to change game conditions, such as by removing certain blocks or changing the makeup of the game board. Items in this category are typically named for a physical object, such as a "rocket," a "bomb," an "anvil," or a "glove."

37. The third category is in-game currency, called "coins." Coins may be used to purchase additional moves or the special items described in the second category above.

38. The Games sell "bundles" or "packs" of multiple items in various compositions and at different price levels. Toon Blast sells packs at prices ranging from $0.99 up to $99.99, including packs at $19.99, $39.99, $79.99, and $99.99. Toy Blast sells packs at similar price ranges, including at $6.99, $12.99, 24.99, $24.99, $49.99, and $99.99.

**II. The Games use false and deceptive sales tactics.**

39. The Games use a series of false and deceptive advertising tricks to artificially inflate the perceived worth of the bundle of items that players purchase.

40. Players are directly presented with offers of limited time discounts or special sales, suggesting that the packs contain items valued at more than the offered price.

41. In fact, these supposedly discounted items are perpetually offered on discount and there are no competitors selling similar products for Toon Blast or Toy Blast, i.e. the "discount" or "sale" price is not actually discounted or on sale from any legitimate original price.

42. Defendant shows false discount and sale offers to new players of the Games from the very start of their game play.

43. For instance, both Toon Blast and Toy Blast offer a "Beginner's Bundle" that is supposedly on "Sale." The Bundle, however, is not on "Sale." It's the standard price of the pack, and the label of a "Sale" is just deceptive marketing.

44. Pictured here is the Beginner's Bundle in Toon Blast.

45. And pictured here is the analogous pack in Toy Blast.




46. In addition to fake "sales," the Games constantly bombard players with false reference pricing, which creates the illusion that the packs are worth more than the offered "sale" price. The Games advertise packs at huge discounts, often ranging from 60% to 90% "off." But these packs were never for sale at an original price that would support this calculation.

47. Offers also frequently display countdown timers, creating the illusion of scarcity and of a limited-time offer in order to pressure players into making purchases.

[Space is intentionally left blank]

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

48. The two below examples, featuring false discounts and false countdown timers, are from Toon Blast. The "Team Pack" and the "Progress Pack" are ubiquitous in the Games.







49. The Team Pack above left offers a purportedly discounted bundle for $4.99, advertising a discount of "70% off." But that pack is never for sale at $16.63 (what would be the reference price based on the discount percentage), nor anything close to it.

50. The false discount makes players believe that the pack is a premium item, containing items with a total value on par with packs sold for more than $15. But the total value of the goods in the Team Pack is nowhere close the value of packs sold in the $15-20 price range.

51. To illustrate, the pack most comparable to the Team Pack's false reference price is the "Super Bundle," sold for $19.99. Compared with the $4.99 Team Pack shown above, the Super Bundle (shown below) includes twice as many coins and four times as many of each of the special items (albeit with one fewer hour of infinite lives gameplay, denoted by the heart with the infinity symbol inside).

[Space is intentionally left blank]

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103




52. This comparison shows it would be absurd to sell the Team Pack at its supposed reference price of $16.63 because it contains less than half of the items included in other bundles offered at those prices. In other words, the Team Pack's false reference price deceives players into believing they are purchasing a more premium pack, one worth much more money than the actual value of the Team Pack. That deception motivates players to purchase the Team Pack.

53. Toy Blast uses the same tactics, making false claims of "sales," offering bogus discounts, and using timers to create a false pressure on the player to make purchases. For instance, the two "Special Offers" pictured here are identical. This "offer," like others, is made repeatedly.







54. The advertised original pricing implied by the purported "70% off" discount does not reflect any prevailing market retail pricing for these virtual in-game items. These items have no real-world value; their pricing is entirely determined by Zynga.

55. Upon information and belief, these deceptive practices are used constantly in the Games. Defendant manipulates its in-game marketplace, preventing players from forming an impression of the true value of the in-game goods. The image below shows a post from a Reddit user summarizing this dynamic.




**III. Although ostensibly "free" to play, players struggle to advance without making purchases.**

56. Players of the Games find that successive levels become more and more difficult to complete without the purchase and use of in-game items. As noted by the Reddit user (and experienced Toon Blast player) in the post pictured below, "it should be possible to beat [a level] without the use of boosters, ads, coins, etc." But some levels are, for practical purposes, not beatable without these add-ons. (The post is directed at "Peak Games," the original developer of the Games and a subsidiary of Defendant Zynga.)

[Space is intentionally left blank]



JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103


r/ToonBlast • 5 days ago
octoberstuart

**If you're a Toon Blast developer or work for Peak Games, please read.**

It has become quite obvious that the developers of Toon Blast play test their levels using the Magic Disco. And while most of the time players get introduced to a new level they have it enabled, it's important to recognize that when you make a level it should be possible to beat without the use of boosters, ads, coins, etc. that not everybody has guaranteed.

This level takes 16 moves to beat. With the magic disco? No sweat. One double disco combo wipes out 80 percent of the level. But that's a powerless combo without the magic disco because the clams close back up. 16 moves, with insanely good luck, is still not even close to possible when playing without any extra powerups. The developers need to fix this for their levels.

Players do not have a right to use the magic disco power up in their levels; rather it is a privilege. It's rather bold of Peak to assume everyone has the ability to beat the levels they throw at them without considering if they have the money to progress or if they have the magic disco enabled. They should play test their levels by playing them standard, without any boosts, and then the average amount of moves it takes to beat the level on the first attempt should be how many moves the level is assigned to it. Simple. But they clearly don't do this.

If you've read this far I wish you the best of luck with your toon blast levels. I'm sure no one cares about my rant but I had to throw it out there as a Hail Mary.

57. The above player is not alone. Other experienced players note the same, including the below-pictured reply commenter, who noted, "the game is a PAY 2 PLAY game."


Popular_Amphibian483 • 4d ago

1000000% spot on. I have been trying to say what you have said for a year now. This magic disco ball is a necessity to pass most of these levels. The game is a PAY 2 PLAY game. Once you have reached CLeague they throw in these unbeatable levels without the Magic. Love the post!!!

8 Reply Award Share ...

58. Inexperienced players notice the pay-to-play dynamic, too. The Redditor in the post shown below, self-proclaimed as "pretty new to the game," notes that, "[Toon Blast] feels so rigged, like the levels are designed to be ridiculous to entice you to spend coins and real money just to beat the level."


r/ToonBlast • 13 days ago
Deepfried_Shrimp321

**Pretty new to this game but does anyone else feel this way?**

This game feels so rigged, like the levels are designed to be ridiculous to entice you to spend coins and real money just to beat the level, the rockets are ridiculously rigged and the block placements seem to never be in favour as well, and some of the levels have a ridiculous requirement but barely any moves, anyone else fee this way?

59. As each level becomes increasingly more difficult, and users are unable to complete a level, the Games pressure players into using gold coins to buy extra moves. For example, the

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Games induce players to fear the loss of their winning streaks or competitions (and promised rewards) if they decide not to make the purchase.

60. For instance, as one of many examples of special competitions designed to pressure players to spend more money, the "Toon Race" promises players to "Be the first to beat 15 levels and win amazing rewards!" If a player has played 14 levels and has run out of moves on the 15th level—something that is more and more likely as the difficulty of each level only increases—the player can simply spend money to beat the 15th level without restarting so as to not lose their win streak and the promised prizes for continuing that win streak.

61. Both games offer a unit of in-game coins for $1.99, which buys 100 coins in Toon Blast and 40 coins in Toy Blast. Because of Defendant's strategic placement and manipulative tactics of offering these for sale when a user will lose a level—and if that level is lost the player will break a winning that nets "amazing rewards" if the streak is not broken—the $1.99 coin pack is one of the Games' most popular. Users end up repeatedly paying $1.99 to avoid losing their winning streaks once out of moves. A typical offer for this pack of coins from Toon Blast is pictured below.




**IV. The Games artificially increase prices and deceive consumers into paying more with claims of false discounts and other dark patterns and intentional manipulations.**

62. Defendant's tactics induce Plaintiffs and members of the proposed Class to spend

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

enormous sums, as much as hundreds or thousands of dollars. These tactics are examples of dark patterns—manipulative design practices—the FTC identified in its September 2022 report, Bringing Dark Patterns to Light.[12]

63. As the FTC explained, the manufacture of "URGENCY," as with a "Baseless Countdown Timer" or "False Limited Time Message," along with "False Discount Claims," "[c]reate[s] pressure to buy immediately," and can thus serve as a basis for a violation of the FTC Act.

64. Defendant exclusively controls the in-game marketplaces in the Games, which do not function like actual marketplaces.

65. Players are constantly shown false and misleading information—false discounts and false expiration timers—presented in various layouts and in reference to various baskets of goods. As a result, players struggle to form an understanding of the true basis value of any of the in-game goods they might buy.

66. In addition, Defendant's claims of massive fake discounts trick consumers into believing they are purchasing packs that would cost much more money absent a sale or discount.

67. Fake discounting schemes are widely recognized as powerful tools in convincing customers to make purchases, with higher reference prices leading to higher selling prices.

68. By definition, a fake price offers a fake discount—a discount that does not represent a decrease from any actual previous selling price. The impact of discounts on consumer behavior is well-documented.[13]

**V. The Games foster addictive tendencies.**

69. With players in the dark as to the value of the goods available for purchase, they are

---

[12] FTC Staff Report, Bringing Dark Patterns to Light (Sept. 14, 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf.

[13] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018), available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf; See, e.g., Richard Staelin, Joel E. Urbany, and Donald Ngwe, Competition and the Regulation of Fictitious Pricing, 1-21 Journal of Marketing (2023); Armstrong, Mark and Yongmin Chen (2019), "Discount Pricing," Economic Inquiry, 58 (4), 1614–27.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

then asked to make purchase decisions at a very high frequency, a psychologically manipulative practice known to foster addictive tendencies, as explained below.

70. The Games themselves are designed to be addictive, constantly stimulating the brain's reward centers in the same manner as slot machines, including by providing "auditory and visual rewards for winning moves," offering "incremental rewards that reinforce 'correct' behavior," and creating "an illusion of control."[14]

71. Defendant then implements another layer of addictive game design by offering microtransactions, i.e. items for sale at small amounts but at high velocity and frequent intervals, so that Defendant can take advantage of and foster addictive tendencies with respect to the transactions themselves. "Both classical and operant conditioning theories suggest that more frequent events or quicker pay out frequencies could increase the likelihood of problematic microtransaction purchase behavior and problem gambling symptoms through reinforcement."[15]

72. Thus, by tricking players into making many smaller, time-sensitive purchases of purportedly high-value packs that are nominally on "sale" or heavily discounted for a limited time, Defendant deliberately fosters addictive behaviors and lures consumers into dangerous spending habits—similar to a gambling addiction.

73. Defendant also fosters addiction by offering a shifting catalogue of deceptive sales. Players are unsure whether and how often the "sales" will be repeated. Variable rewards, meaning positive results that manifest with unknown likelihood, are a staple of addictive video game design.[16]

74. As an editorial in the Society for the Study of Addiction observed:

---

[14] Harrigan, Kevin A., Karen Collins, Michael J. Dixon, and Jonathan Fugelsang. "Addictive gameplay: What casual game designers can learn from slot machine research." *In* Proceedings of the international academic conference on the future of game design and technology, pp. 127-133. 2010.

[15] Gibson, Erin, Mark D. Griffiths, Filipa Calado, and Andrew Harris. "The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review." *Computers in Human Behavior* 131 (2022): 14.

[16] Pirrone, Davide, Regina JJM van den Eijnden, and Margot Peeters. "Why we can't stop: The impact of rewarding elements in videogames on adolescents' problematic gaming behavior." *Media Psychology* 27, no. 3 (2024): 380.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
>
> …
>
> Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.[17]

75. As a result, if Plaintiffs and the Classes could ever have reasonably realized that the limited "sales" and discounts were fake, such realization would have occurred only after enough game play that Defendant would have already achieved its goal of establishing addictive spending habits. Thus, to the extent Plaintiffs or any of the class members continued to make purchases after developing an understanding that the packs were not actual discounts, this was the calculated and intended result that Defendant sought when engaging in this deceptive and unfair practice in the first place.

76. Defendant has also developed multiple patents designed to get users to spend money on repeated in-game microtransactions.

77. As Defendant's Patent No. 11,948,433, "Managing computer-implemented game economies," explains, to make revenue, its microtransaction-based games need to keep players continually engaged and continually incentivized to make additional purchases:

> Player retention is of significant concern in the provision of such online games, considering that, in contrast to e.g. console games, massively multiplayer online games are typically made available for download and installation free of charge, with game revenue typically being from advertising revenue and in-game spending. **Both of these**

[17] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286

> **revenue sources are directly and exclusively dependent on continued player engagement and actual gameplay**.

78. To keep individuals hooked on the Games and spending money, Defendant even develops models to predict which users are likely to spend money, how much money they are likely to spend, and what type of false or misleading advertising to use to maximize revenue. For instance, Defendant's Patent No. 10,482,100 details Defendant's "prediction model generator" that "generates a model to predict the likelihood of a player making a purchase or payment in the game," and then pairs a recommendation model to trick players into spending more. For "likely buyers," Defendant's model recommends that "in-game personalization may be used to aggressively target revenue features (e.g. flash sales, etc.)" and by "showing a discount offer to Likely Buyers 2x more often as compared to that shown for Non Likely Buyers."

79. The prediction model also includes an "Up Selling or customized bundled offer module" that may be used to predict the average spending power of a user, and then up-sell packages to users based on their wallet size. In addition, "the model may be used in designing dynamic customized bundles based on likelihood to pay."

80. Defendant has also developed a "game management system" that creates a "multidimensional parametric player model" to allow game customization to maximize user retention, as explained by Defendant's Patent No. 11,291,915.

81. Defendant analyzes players' "motivation to play the game," including emotional states like "happy," "frustrated," "shocked," "annoyed," regret," which will allow "emotion engineering in the game and tweak the game design to induce desirable emotions." The mobile application can then be targeted to continue engagement based on what motivates an individual player:

> Improvement: building skill; overcoming challenges; feeling mastery over a system.
>
> Overcoming: Feeling smart: figuring out a puzzle; figuring out the best strategies for a puzzle type. To sustain this puzzle-solving pleasure, game designers would ideally vary the way levels are structured, so players can feel smart more often, from figuring out the best way to play for that particular level/game configuration.
>
> Habit: Following routine, grind—To sustain this pleasure, players should be rewarded for engagement; they should feel like they are



JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

> making progress if they show up everyday. E.g., tricky match 3 levels tend to eventually let you through by virtue of the RNG if you play enough times.
>
> Novelty: Experiencing novelty; desire to experience new levels, challenges, or features.

82. Defendant has even perfected its pattern of fake discounts to sell items at a price and at a specific discount percentage tailored to each user. As Defendant's Patent No. 103,69,475, entitled "Customized offers for sales of combinations of virtual items," explains, Zynga has developed a model to choose the discounts and sales that it believes will appeal best to each user.

83. "The presenting suggests that the combination of virtual items is randomly selected from a set of virtual items or that the discounted price is randomly selected from a set of discounted prices. However, in actuality, the combination of virtual items or the discounted price may not be selected randomly."

[Space intentionally left blank]

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

84. Rather, games using this technology create bogus discounts tailored to individual players to maximize the chance players will make those purchases, as illustrated by Figures 7 & 9 of the patent:




85. As the patent explains, Defendant employs an "offer-generation module" that uses a variety of data points about an individual user to present a "sale" that is most likely to cause the player to make a purchase, including "the combinations of virtual items and discount percentages that are most likely to increase revenues received by an operator of the game networking

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

system." Defendant uses these inputs to determine the distribution of discounts "that maximizes the revenues received."

86. Zynga has been enormously successful in designing its "free" mobile games to induce users to spend money. An April 2022 study Zynga commissioned with YouGov found that mobile gamers, including on Zynga games, "are engaged throughout the entire day" and "they play morning, noon and night." The study also found that Zynga users spent more money on Zynga's "free games" than the average active mobile gamer, with Zynga players spending $26 per month whereas the average mobile user only spent $15 per month.[18]

87. Discovery will show how many of these and other manipulative game play mechanics that Zynga developed in its patents (or elsewhere) have been applied to the Games.

**VI. Zynga violates the VPPA**

88. The VPPA was enacted in 1988 in direct response to the unauthorized disclosure of an individual's video rental records. During the confirmation hearings of Judge Robert Bork, a local newspaper obtained and published his video rental history, highlighting the ease with which personal information could be accessed and disclosed without consent. This incident underscored the need to create legal protections of personal privacy in the context of video viewing.

89. Congress responded by passing the VPPA, designed to prevent the unauthorized disclosure of video viewing information. The law prohibits "video tape service providers" from sharing personally identifiably information ("PII") about consumers without their informed, written consent. The statute requires that any consent to disclose such information must be clear, distinct, and separate from other agreements, establishing a robust standard for privacy protection.

90. Zynga collected and shared Plaintiffs' PII without obtaining the requisite consent.

91. Zynga incentivizes players of the Games to watch pre-recorded video advertisements, which provide a separate revenue stream from in-app purchases and are a significant source of revenue for Zynga.

92. For instance, as illustrated in paragraphs 59 to 61, above, when users run out of

[18] https://web.archive.org/web/20240718152600/https://www.zyngaads.com/wp-content/uploads/2022/07/B2B-Ad-Research-Report-5.3_Publish.pdf

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

moves to beat a level, they can watch video advertisements to get additional moves. Users are also occasionally able to receive additional in-game items by watching video ads.

93. Zynga estimates that "85% of Zynga gamers enjoy in-game ads that offer rewards or incentives for engaging with them."[19]

94. As Zynga explained in its 2020 Annual Report, "Our advertising services offer creative ways for marketers and advertisers to reach and engage with our players while allowing continued operation of a free-to-play business model. Our advertising offerings include: . . . *Engagement Advertisements and Offers in which players can participate in watch-to-earn engagements or other offer engagements*."

95. Zynga made $302.5 million in mobile game advertising revenue in 2020.

96. The 2020 Annual Report demonstrates how Zynga leverages the expansive data it captures from its players to monetize their games, including through advertising:

> At the core of Zynga's live services platform is our first-party data network, which captures key insights about how our players are interacting with our games. We use this data to deliver highly engaging interactive experiences for our players, optimize our user acquisition and determine how to best monetize our games, including advertising. By leveraging the scale of our audience base and investing in additional advertising technologies and solutions, we have the ability to expand our access to advertising data and unlock more value from Zynga's network of games.

97. To maximize advertising value, Zynga allows targeted advertising. This revenue stream is so important to Zynga that it even listed technological developments that make it more difficult to allow targeted advertising as a risk to the company.

98. As the 2020 Annual Report states:

> We derive a significant portion of our revenues from advertisements and offers that are incorporated into our free-to-play games through relationships with third parties. If we are unable to continue to compete for these advertisements and offers, or if any events occur that negatively impact our relationships with advertisers, our advertising revenues and operating results would be negatively impacted.

[19] https://www.zyngaads.com/ad-solutions

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

99. The Report then explains how certain technological changes that do not "support[ ] the delivery of targeted advertising" would harm Zynga's "ability to deliver effective advertising campaigns on behalf of our advertisers . . . which could cause our business, financial condition, or results of operations to suffer."

100. To this day, video advertising remains central to Zynga's strategy to profit from its mobile applications, including the Games. It maintains a website dedicated to promoting advertising to third parties, https://www.zyngaads.com/, where it touts that "83% of our players become aware of a new product from in game ads"; "70% of our players are likely to look into non-gaming products after seeing an in game ad"; and "45% of our players purchase a product after seeing an in game ad."

101. Plaintiff Garcia watched pre-recorded video advertisements when playing Toon Blast.

102. Zynga claims that "Video" is "High-impact storytelling" that allows advertisers to "[c]aptivate highly engaged gamers between levels by serving a single unscrollable video per ad break." It further brags that "[o]ur unskippable, immersive format ensures your brand captures player attention."

103. Zynga offers three types of video ads to its advertising partners: "Non-Skip Video"; "Rewarded Video"; and "First Impression Takeover."

104. "Rewarded Video" is used in the Games, and "give[s] players the choice of when and how they interact with your brand. 85% of Zynga gamers enjoy in-game ads that offer rewards or incentives for engaging with them. With Zynga, you're the hero."[20] Zynga displays an example of a video advertisement to LA-Z-Boy in the Toon Blast game:

[20] https://www.zyngaads.com/ad-solutions

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103




105. As Zynga's Vice President of Global Brand Sales and Partnerships Gabrielle Heyman has explained, "Rewarded video ads are the gold standard for video in games because players are in complete control over the ad experience — they can choose if and when they see an ad. . . . When there's some friction point in the game, and they have to either pay for an in-app purchase to get over that hump or watch an ad to give them the lives needed to continue — it helps propel the game. Additionally, it performs well as the consumer's attention is centered on the game."[21]

106. On information and belief, when players, including Plaintiff Garcia, watched video advertisements in the Games, their PII and video viewing history were shared with third parties, including Zynga's advertising partners, so that Zynga could profit from selling targeted advertising.

107. As Zynga explained in a sponsored article dated June 27, 2024, "Essentially, video is video, no matter where it appears. When it's within mobile games, it's a brand-safe space where advertisers can choose the genre and target the audience that best works for them."[22]

108. Zynga's advertising partners that deliver "personalized advertising" include Facebook (Meta), Aarki, Ad Generation, AdColony, AdMob (Partner List), Amazon, AppLovin, Baidu, Chartboost, Conversant, Criteo, EMX Digital, Fyber, Improve Digital, Index Exchange, InMobi, ironSource, Kayzen, LifeStreet, LoopMe, Lotame, Magnite, Media.net, Mintegral, Oracle/Moat, MobFox, MobileFuse, Moloco, Nielsen Reporting, Nielsen Measurement, OneTag,

[21] https://digiday.com/sponsored/as-video-investment-increases-mobile-in-game-video-ads-are-on-the-rise/

[22] https://digiday.com/sponsored/as-video-investment-increases-mobile-in-game-video-ads-are-on-the-rise/

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

OneTrust, OpenX, Pangle, Playwire, PubMatic, Pubnative, PulsePoint, Salesforce, ShareThrough, Smaato, Smart Adserver, SmartClip, Sonobi, Sovrn, SpotX, TapJoy, Tappx, TripleLift, Unity Ads, UnrulyX, Verve, VRTCAL, Vungle, Xandr, Yahoo Inc., Yeahmobi, Yieldmo, YieldOne, DoubleVerify, Integral Ad Science, Kantar Media, Claritas, Disqo, Upwave, Foursquare, Outreach.IO, and Experian.[23] Zynga admits that only Facebook (Meta) has even purported to separately obtain a player's consent to share data and receive personalized advertisements.

109. Zynga's promotion of video advertising highlights its "best-in-class campaign reporting and research partners to gain insights, guide optimization & confirm impact," that "every impression and engagement is tracked, including media, sponsorships & playables," and that it provides advertisers with first party, third party, and contextual "Targeting Performance"[24]:




110. Zynga has also bragged how its "[t]argeting capabilities in mobile games are extensive," explaining that Zynga "think[s] about targeting data in three buckets: demographics, interest and purchase intent. . . . Whether it's first-party, second-party, third-party data or contextual, you will have to use all of them to maximize reach."[25]

111. Zynga incorporates the Privacy Policy of its parent company, Take-Two Interactive Software Inc. The Privacy Policy admits that Zynga shares a wide range of PII and a user's game activity with third parties.

112. For instance, Zynga collects:

[23] https://www.zynga.com/legal/ads/

[24] https://www.zyngaads.com/ad-solutions

[25] https://digiday.com/sponsored/as-video-investment-increases-mobile-in-game-video-ads-are-on-the-rise/

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

> **Identifiers / Contact Information**: Name, user name, gamertag, postal and email address, phone number, unique IDs, mobile device ID, platform ID, gaming service ID, advertising ID (IDFA, Android ID) and IP address . . .
>
> **Internet / Electronic Activity**: Web / app browsing and gameplay information related to the Services; information about your online interaction(s) with the Services or our advertising; and details about the games and platforms you use and other information related to installed applications . . .
>
> **Device and Usage Data** "device type, software and hardware details, language settings, browser type and version, operating system, and information about how users use and interact with the Services (e.g., content viewed, pages visited, clicks, scrolls)."

113. Zynga even admits it creates a "personalized profile" of its users:

> **Profile Inferences**: Inferences made from your information and web activity to help create a personalized profile so we can identify goods and services that may be of interest.

114. Zynga also admits that "we share your information with . . . advertising service providers and third-party advertising partners."

115. Zynga "has sold and/or shared unique identifiers, IP address, as well as Internet/Electronic Activity and Profile Inferences with third-party advertising providers to enable us to provide personalized advertising to you and others like you."

116. Zynga states that it only does "not sell or share personal information" about users that Zynga knows are under the age of 16.

117. Separate from the Privacy Policy, Zynga even recently admitted to Toon Blast players (although apparently not yet to Toy Blast players) that it shares their PII and video viewing history.

[Space intentionally left blank]

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

118. Based on Plaintiffs' counsel investigation, a pop-up implemented in Toon Blast in late March 2025 disclosed that Zynga "share[s] your personal and video viewing information with" "third-party services for advertising and analytics purposes":




119. While this disclosure attempts to obtain a user's consent, it is inadequate. Not only did Zynga never attempt to specifically obtain a user's consent to share PII and video viewing histories with third parties at any point before the institution of this pop-up in late March 2025, the pop-up itself does not satisfy the VPPA's specific consent requirements because it is not "informed, written consent" that must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. 18 U.S.C. § 2710(b)(2)(B).

120. In addition, in the newly updated Toon Blast privacy center, Zynga further discloses that it shares PII and video viewing history with advertisers:

> We rely on ads to keep this app free and would like to show you more personalized ads in-game. In order to personalize ads, we allow certain online advertising partners (here)[26] to collect information about you (e.g. profile information you provide us, your device

[26] This links to Zynga's advertising partner list.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

> Advertising ID and other device information). This is considered a "sale" or "share" in certain U.S. states. We may also share your personal and video viewing information with third parties for advertising.

121. In sum, Zynga has violated the VPPA as to Plaintiff Garcia and every other player that watched videos in any of its many mobile games for whom Zynga did not obtain consent in the matter and form required by the VPPA.[27]

## CLASS ACTION ALLEGATIONS

122. Plaintiffs bring this lawsuit as a class action under Federal Rule of Civil Procedure 23.

123. All Plaintiffs bring this action on behalf of themselves and on behalf of the following Classes, initially defined as follows:

> **Nationwide Class**: All persons in the United States, within the applicable statute of limitations, who made in-app purchases, in the Games.

> **California Class**: All persons, within the applicable statute of limitations, who made in-app purchases in the Games while in California.

124. Plaintiff Garcia also brings this action on behalf of himself and on behalf of the following Class:

> **VPPA Class**: All persons, within the applicable statute of limitations, in the United States who have watched pre-recorded video content in any of Zynga's mobile applications.

125. Excluded from each Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.

126. Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

127. The claims of all class members derive directly from a single course of conduct by

[27] https://www.zynga.com/games/

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Defendant. Defendant has engaged and continues to engage in uniform and standardized conduct toward the class members.

128. Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of Plaintiffs' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

129. Accordingly, Plaintiffs bring this lawsuit as a class action on Plaintiffs' own behalf and on behalf of all other individuals similarly situated pursuant under Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

130. Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

131. **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The members of the proposed Class are so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the class includes tens of thousands, if not hundreds of thousands of members.

132. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)): Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

a) Whether Defendant engaged in the conduct alleged in this Complaint;

b) Whether Defendant violated the applicable statutes alleged herein;

c) Whether Defendant's conduct emanated from the State of California;

d) Whether Plaintiffs and the class members are injured and harmed directly by Defendant's conduct; and

e) Whether Plaintiffs and the class members are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts.

133. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)): The claims of the Plaintiffs and the

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

respective Class are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to the Plaintiffs and Classes. Plaintiffs and all class members are similarly affected by Defendant's wrongful conduct and were damaged in the same way. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other class members. Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

134. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)): Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the class members, and they have retained counsel competent and experienced in complex class actions, mass arbitrations, and consumer litigations. Plaintiffs and their counsel will fairly and adequately protect the interest of the class members.

135. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)): A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the thousands of cases that would need to be filed. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

136. **Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(2)): In the alternative, this action may properly be maintained as a class action, because:

a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant; or

b) the prosecution of separate actions by individual class members would create a risk of

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c) Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

**CALIFORNIA LAW APPLIES TO THE ENTIRE NATIONWIDE CLASS**

137. California's substantive laws apply to every class member, regardless of where in the United States the class member resides.

138. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, and a significant aggregation of contacts, with the claims asserted by Plaintiffs and all class members, creating state interests such that the choice of California state law is not arbitrary or unfair.

139. Defendant's United States headquarters and principal place of business is located in California. Defendant's key executives and employees are located in California. On information and belief, Defendant also owns property and conducts substantial business in California. Therefore, California has an interest in regulating Defendant's conduct under its laws. Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims here constitutionally permissible.

140. Upon information and belief, California is the state from which Defendant's alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiffs and all other class members.

141. The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here than any other interested state.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**TOLLING**

142. Any applicable statute of limitations is tolled under the "delayed discovery" rule. Plaintiffs had no knowledge—nor any reasonable means of discovering—the truth behind Defendant's false and manipulative marketing scheme nor that their personal information and video viewing histories were being transmitted to third parties without consent.

**THE CLAIMS ARE NOT SUBJECT TO ARBITRATION**

143. On occasion, when players log into the Games, Zynga attempts—surreptitiously and haphazardly—to secure a user's notice and assent to Take Two's Terms of Service.

144. In a good faith effort to resolve claims expeditiously and to avoid protracted litigation about Zynga's unenforceable attempt to bind users to its parent company's invalid arbitration clause, Plaintiff Garcia, along with other individuals also represented by undersigned counsel (the "Arbitration Claimants"), sent a notice of dispute on July 30, 2024 and initially attempted to arbitrate claims against Defendant's parent company, Take-Two Interactive Software Inc. ("Take Two"), under Take Two's 2019 Terms of Service, which mandate arbitration in JAMS.[28]

145. In response, Take Two contended that it had imposed updated 2024 Terms that applied even to already accrued claims—despite the 2019 terms explicitly stating that "the Company does not have the right to alter this agreement to arbitrate or the rules specified herein with respect to any Dispute once that Dispute has accrued." Take Two did not at that time contest that the 2019 Terms had governed these disputes, it simply asserted that it had changed the rules since imposing those terms.

146. Instead of arbitration in JAMS, the 2024 Terms contain an unconscionable and unenforceable "Mass Arbitration Procedure" under New ERA ADR's rules, which the Ninth Circuit concluded are so unconscionable that the dispute resolution process in question is not even an "arbitration" within the meaning of the Federal Arbitration Act. *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670 (9th Cir. 2024).

147. Despite their disagreements with Take Two over the enforceability and application

[28] Defendant Zynga is the entity that is directly liable for the conduct alleged in this Complaint, but Take Two is also liable because it controls Zynga and is ultimately responsible for its conduct.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

of the 2024 Terms, Plaintiff Garcia and the Arbitration Claimants attempted in good faith to pursue informal dispute resolution with Take Two, and entered into a tolling agreement with Take Two on August 27, 2024 that contemplated information exchange and a mediation.

148. As part of the information exchange, Take Two asked for User IDs from the Arbitration Claimants, purportedly to facilitate dispute resolution.

149. User IDs are not required to play the Games and are not readily accessible to players.[29] Nonetheless, nearly 300 Arbitration Claimants provided User IDs, as requested. Upon information and belief, Take Two did nothing with this information, despite claiming it was needed to resolve claims. Take Two and the Arbitration Claimants then engaged in mediation on December 17, 2024, which was unsuccessful.

150. The Parties extended their tolling agreement to February 28, 2025, in a final attempt to informally resolve the claims of the Arbitration Claimants, notwithstanding the failed mediation.

151. But rather than acting in good faith, Take Two used the additional time to devise a new set of Terms to once again change the dispute resolution procedure.

152. On February 28, 2025, the very same day that the Tolling Agreement expired, Take Two updated its Terms, adding a new notice requirement transparently designed to make it more difficult for Arbitration Claimants to bring claims, and changing the arbitration rules again—this time to JAMS' Mass Arbitration procedures (presumably because it recognized the New ERA ADR rules were unenforceable).

153. When the Tolling Agreement expired, some of the Arbitration Claimants (not including Plaintiffs) filed their claims in JAMS before Take Two attempted to bind them to the new 2025 Terms.

154. Right after those arbitrations were filed, Take Two began updating the Games with a pop-up screen to purportedly secure notice and assent to the new 2025 Terms. The implementation

---

[29] At the time, Take Two did not even provide instructions on how to access User IDs. To find them players had to go to the "Settings" screen, then tap on the screen—not on any visible button—six or seven times, to see a User ID number displayed at the bottom of the screen. If a user tapped too many times, however, the User ID would disappear.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

of this notice was haphazard and ineffective.

155. Take Two then objected to JAMS' attempt to administer these arbitrations. For the first time, after months of informal dispute resolution, it now contended that none of the Arbitration Claimants ever agreed to the 2019 Terms, and that the applicable terms for that time period provided for dispute resolution in the Courts of Turkey. (Its previous position was that it had validly amended its arbitration agreement in 2024 to apply retroactively and require dispute resolution with New ERA ADR).

156. Take Two also demanded that all Claimants provide User IDs so that Take Two could unilaterally determine which Terms applied. To do so, Claimants would need to log in to the Games to access the User IDs.

157. This was problematic for the reasons explained by counsel in an April 4, 2025 email, quoted below:

> We're also happy to consider collecting and providing further User IDs—especially in light of the recent updates un-burying them inside the apps. However, this may not be possible absent some agreement that Take-Two won't seek to enforce the 2025 terms update on our clients. As your client is surely aware, players must open the apps to access their User IDs, and it appears that Take Two is updating the games so that at least some players cannot open the apps without first pressing "Accept" on a pop-up regarding the recent terms update. We don't imagine Take-Two would attempt to enforce those new terms (revised on the exact day our tolling agreement expired) on our clients who are represented parties with whom it has been negotiating since summer 2024, but Take-Two would need to expressly confirm this.
>
> Accordingly, if Take Two wants additional User IDs other than what we have already provided, it must confirm it will not seek to enforce the 2025 Terms against our clients.

158. Take Two never responded to this email.

159. Instead, Take Two inaccurately informed JAMS that the Arbitration Claimants had "refused" to provide User IDs.

160. Take Two also took the position that it could modify its arbitration agreement at any time and confirmed its intention to enforce the 2025 Terms on the Arbitration Claimants.

161. On May 9, 2025, the Arbitration Claimants informed JAMS they would instead seek

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

relief in court, given (a) Take Two's bad faith conduct in response to the Arbitration Claimants' efforts to resolve their claims informally or in JAMS arbitration, including its use of information exchanged in mediation and informal dispute resolution to redesign the mobile applications in an attempt to force Claimants to agree to new Terms if they wanted to even to try to arbitrate—contending that User IDs are required before any arbitrations could proceed while intentionally redesigning the Games so that the only way a claimant could get a User ID would involve seeing a pop-up attempting to bind them to a new set of terms; and (b) the fact that arbitration with Take Two has proven, among other things, illusory, as Take Two's position as to arbitration keeps changing,

162. Through the conduct of its parent company, Defendant has waived any right to enforce Take Two's Terms or to arbitrate the claims of Plaintiffs and any class members due to, among other actions, its parent company's refusal to arbitrate claims, rewriting of its arbitration clause using information exchanged in mediation related to the arbitrations to prevent the arbitrations from proceeding, and for attempting to foist new changes to the arbitration clause on already-filed claims.

163. In addition, any other purported "arbitration" clause that might apply is unenforceable for multiple reasons, including for lack of notice and assent, unconscionability, and because it is not even an "arbitration" within the meaning of the Federal Arbitration Act.

164. Plaintiff Dougherty did not play Toy Blast at any time when, according to Take Two's latest yet ever-changing position on what arbitration clause governs, playing the game purported to subject users to an arbitration clause. Plaintiff Dougherty was not one of the Arbitration Claimants discussed above.

165. Plaintiff Camargo did not have notice of or assent to any arbitration clause, and was not one of the Arbitration Claimants discussed above.

166. Further, although not required because the 2025 Terms are unenforceable in their entirety, all three Plaintiffs have opted out of those Terms.

167. Accordingly, none of Plaintiffs' or the Classes' claims are subject to arbitration.

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

**COUNT I**

**Violations of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professional Code §17200 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

168. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

169. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

170. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

171. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

172. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

173. Defendant has violated the "unlawful" prong under the UCL and have engaged in "unfair, deceptive, untrue or misleading" advertising.

174. The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes—similar to Defendant's falsely discounted packs in all material respects—as deceptive practices that would violate the FTC Act.

175. 16 C.F.R.§233.1 states:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $______"), unless substantial sales at that price were actually made.

176. California law also prohibits false former pricing schemes. Cal. Bus. & Prof. Code §17501, entitled "Value determinations; Former price advertisements," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

177. As further detailed in the Second Claim for Relief below, California's False

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13).

178. In-game advertising that uses false discounting and manufactures false urgency violates the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

179. In-game false discounting advertisements misrepresent the existence of a sale whereby players can allegedly purchase more items and resources from a pack than they normally could for the same price.

180. Defendant's use of in-game advertising that uses false discounting and manufactures false urgency violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

181. Defendant also violated and continues to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within the three months preceding the publication and dissemination of advertisements containing the false former prices.

182. Defendant has also violated the "unfair" prong of the UCL by falsely representing that its consumers received a discount from an implied former price where, in fact, Defendant set an arbitrary price for the goods contained in these packs and then falsely pretended the packs had ever been offered without their supposed discount.

183. Defendant has also violated the "unfair" prong of the UCL by engaging in predatory practices designed to foster gambling addiction in consumers, in that it: (a) deploys microtransactions in a way specifically designed to ensnare players into addictive spending habits; and (b) falsely creates a sense of urgency, scarcity, and value in order to secure addictive, high frequency microtransactions. Defendant's goals in engaging in these practices are far outweighed by the harm they cause.

184. These acts and practices are unfair because they were likely to cause consumers to

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

falsely believe that Defendant was offering value, discounts, or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers (including Plaintiffs) reasonably understood that they were receiving valuable price reductions on purchases of in-game items. This, in turn, has induced reasonable purchasers to buy such products from Defendant that they would not have otherwise purchased.

185. The gravity of the harm to Plaintiffs and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendant may have had for engaging in such deceptive acts and practices.

186. Additionally, Defendant has violated the "fraudulent" prong of the UCL because their marketing and advertising materials included implied false "original" prices for falsely discounted packs, and because these same materials also suggested that the offers in the false discounted packs were unique, limited, and would no longer be available at those price points following the conclusion of its sale events. In actuality, the packs never contained the limited-time deals or discounts they purported to offer.

187. Defendant's acts and practices deceived Plaintiffs and the Classes at large. Specifically, Plaintiffs and the Classes relied on these misleading and deceptive representations regarding the limited-time bonuses they could expect to receive in the packs. Each of these representations and deceptions played a substantial role in Plaintiffs' decisions to purchase the packs, and Plaintiffs would not have done so in the absence of such representations.

188. Players who purchased falsely discounted packs were deprived of the benefit of their bargains, because the threat of a missed opportunity was a fabrication. There was never a risk of a player missing an opportunity to advance due to their failure to purchase items at their discounted price, because the price was always discounted.

189. As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendant has been unjustly enriched at the expense of Plaintiffs and members of the proposed Classes. Specifically, Defendant has been unjustly enriched by obtaining revenues and profits that they would not otherwise have obtained absent their false, misleading, and deceptive conduct.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

190. Through its unfair acts and practices, Defendant has improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiffs and all class members, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

191. **Permanent public injunctive relief**. Plaintiffs, acting as private attorneys general, also seek public injunctive relief to protect the general public from Defendant's conduct.

192. Defendant's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Plaintiffs, having fallen victim to Defendant's addictive game design, may still play the Games and be deceived and pressured into making in-app purchases, which will be at artificially higher prices due to Defendant's ongoing unlawful conduct. Accordingly, Plaintiffs seek a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

**COUNT II**

**Violations of California's False Advertising Law ("FAL")**

**Cal. Business & Professional Code § 17500 et seq.**

**(By Plaintiffs, individually and on behalf of All Classes)**

193. Plaintiffs incorporate by reference all allegations in this Complaint and restates them as if fully set forth herein.

194. The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

195. Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code § 17501.

196. Defendant's falsely discounted packs misrepresent the existence of a sale whereby

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

players can allegedly purchase packs at a discounted price. Defendant's falsely time-limited packs misrepresent the exclusive nature, and therefore the expected value to gameplay of purchasing the packs.

197. Through their unfair acts and practices, Defendant has improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiffs and all class members, and to prevent Defendant from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

198. Defendant's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Plaintiffs, having fallen victim to Defendant's addictive game design, may still play the Games and be deceived and pressured into making in-app purchases, which will be at artificially higher prices due to Defendant's ongoing unlawful conduct. Accordingly, Plaintiffs seek a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

**COUNT III**

**Violations of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §1750 et seq.**

**(By Plaintiffs, individually and on behalf of All Classes)**

199. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

200. Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

201. Defendant is a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and it sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

202. The Games and their in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

203. Defendant has violated Cal. Civ. Code. §1770(a)(5)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. Packs falsely advertised as discounted and with limited availability offer less value to players than those that are truly temporarily discounted. A player who buys a pack they believe to be temporarily discounted believes they are getting a better deal than they actually are. That player believes their purchase has increased their gameplay value per dollar over the base case where the falsely advertised discount was not given, when they actually have not.

204. Defendant has violated Cal. Civ. Code. § 1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. False claims of discounts convey the impression that a pack of goods has extra value by containing a significant increase in items in those packs as relative to normal versions of packs that are sold.

205. Defendant has violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts.

206. Defendant has violated Cal. Civ. Code. § 1770(a)(16)'s proscription against representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not by misrepresenting that the purchasers have received a competitive advantage in the game by purchasing "sale" and "limited availability" items.

207. Defendant has also violated Cal. Civ. Code. §§ 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that it has intentionally designed the Games to foster gambling addiction in consumers, in that it: (a) deploys microtransactions in a way specifically designed to ensnare players into addictive spending habits; and (b) falsely creates a sense of urgency, scarcity, and value in order to secure addictive, high frequency microtransactions.

208. Plaintiffs and the other class members suffered actual damages as a direct and proximate result of the Defendant's actions, concealment, and/or omissions in the advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as evidenced by the substantial sums Defendant pocketed.

209. Plaintiffs, on behalf of themselves and the class members, demand judgment against

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Defendant for injunctive relief and attorney's fees.

210. Defendant's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Plaintiffs, having fallen victim to Defendant's addictive game design, may still play the Games and be deceived and pressured into making in-app purchases, which will be at artificially higher prices due to Defendant's ongoing unlawful conduct. Accordingly, Plaintiffs seek a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

**COUNT IV**

**Fraud**

**(By Plaintiffs, individually and on behalf of All Classes)**

211. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

212. Defendant represented to Plaintiffs and the class members that various purchased packs were on sale in that they were offered at a lower price than normal.

213. These representations were false because the packs were never offered at higher prices.

214. Defendant intentionally designed the graphical images on the advertisements to attract Plaintiffs to the enticing but false claims regarding the existence of sales.

215. Plaintiffs reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned packs.

216. Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs known the claims were false, they would not have made those purchases, or would have made fewer of them.

217. Plaintiffs' reliance on Defendant's misrepresentations in its pack advertisements was a substantial factor in causing harm to Plaintiffs.

218. Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and the class members and will continue to both damage Plaintiffs and the class members and deceive the public unless enjoined by this Court.

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

**COUNT V**

**Unjust Enrichment**

**(By Plaintiffs, individually and on behalf of All Classes)**

219. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

220. Defendant misrepresented the value of the items or resources contained in falsely discounted packs.

221. Plaintiffs and the class members spent significant amounts of money on falsely discounted packs as well as on other items they were pressured and manipulated into by Defendant's dark patterns and deceptive conduct, and intentionally addictive game design.

222. It would be unfair for Defendant to keep the money spent without compensating Plaintiffs and the class members.

**COUNT VI**

**Violations of the VPPA, 18 U.S.C. § 2710**

**(By Plaintiff Garcia, individually, and on behalf of the VPPA Class)**

223. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

224. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

225. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

226. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering audiovisual materials through the Games, including the prerecorded videos that Plaintiff viewed, which are similar to prerecorded video cassette tapes. Defendant's delivery of video content affects interstate and foreign commerce.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

227. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

228. Defendant knowingly caused personal viewing information, concerning Plaintiff and class members, to be disclosed to third parties. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each class member to third parties, as individuals who viewed Defendant's video content, including the specific prerecorded video materials each such individual watched in the Games. This information allowed third parties to identify Plaintiff and each class members' specific individual video-viewing preferences and habits.

229. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff is a purchaser and subscriber of goods or services from Defendant. Hence, Plaintiff is a "consumer" under this definition.

230. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

231. Defendant was aware that the disclosures to third parties that were shared identified Plaintiffs and class members. Defendant also knew that Plaintiff's and class members' personal viewing content was disclosed to third parties.

232. By knowingly disclosing Plaintiff's and class members' personal viewing content, Defendant violated Plaintiff's and class members' statutorily protected right to privacy in their prerecorded video watching habits. *See* 18 U.S.C. § 2710(c).

233. As a result of the above violations, Defendant is liable to Plaintiff and the class members for actual damages related to their loss of privacy in an amount to be determined at trial

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the VPPA, Defendant also is liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendant in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment on behalf of themself, the Class, and the California Subclass as follows:

A. certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B. awarding Plaintiffs and the Class compensatory damages and actual damages, to be determined by proof;

C. awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

D. for punitive damages;

E. for civil penalties;

F. for injunctive relief on behalf of Plaintiffs and the Classes, as well as on behalf of the public;

G. for declaratory and equitable relief, including a declaration that Defendant violated and has continued to violate the VPPA, California's UCL, the FAL, and the CLRA and an injunction requiring Defendant to comport with California Business & Professions Code §§17200, et seq., and restitution and disgorgement;

H. awarding Plaintiffs and the Class the costs of prosecuting this action;

I. awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

J. awarding pre-judgment and post-judgment interest; and

K. granting any other relief as this Court may deem just and proper.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury for all claims so triable.

Respectfully submitted,

DATED: May 9, 2025

**JANOVE PLLC**
Raphael Janove (*pro hac vice* forthcoming)
raphael@janove.law
500 7th Avenue, 8th Fl.
New York, NY 10018
Telephone: (646) 347-3940

By: *\/s/ Liana Vitale*
Liana Vitale

Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

*Attorneys for Plaintiffs and the Proposed Classes*