**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
500 7th Avenue, 8th Fl.
New York, NY 10018
Telephone: (646) 347-3940

**JANOVE PLLC**
Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

***Attorneys for Plaintiffs and the Proposed Class***

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103 JANOVE PLLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CHERYLL DOUGHERTY, DELIA CAMARGO, and LAWRENCE GARCIA, individually, as private attorneys general, and on behalf of all others similarly situated,

Plaintiffs,

v.

ZYNGA INC.,

Defendant.

Case No. 3:25-cv-04051-SI

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

[Filed concurrently with Plaintiffs' Oppositions to Defendant's Motion to Compel Arbitration and Defendant's Motion to Stay Discovery]

Judge: Hon. Susan Illston
Date: December 19, 2025
Time: 10:00 a.m.
Courtroom: 1

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

## TABLE OF CONTENTS

INTRODUCTION ....... 1

STATEMENT OF THE ISSUES TO BE DECIDED ....... 2

BACKGROUND ....... 2

I. Defendant's Deceptive Marketing Tactics ....... 2

II. Defendant's Use Of Psychologically Manipulative Dark Patterns ....... 3

III. Defendant Tracks Its Users And Makes Huge Profits Selling Their PII Without Consent ....... 4

IV. Plaintiffs Fall Prey to Defendant's Unlawful Tactics ....... 6

LEGAL STANDARDS ....... 7

ARGUMENT ....... 7

I. Plaintiffs Have Adequately Stated Their Consumer Protection Claims ....... 7

A. Plaintiffs satisfy Rule 9(b). ....... 7

B. Plaintiffs adequately allege their consumer protection claims. ....... 8

1. Plaintiffs plead materially misleading false and deceptive advertising. . 8

2. Plaintiffs adequately plead injury and have standing. ....... 9

3. The CLRA covers Defendant's in-game sales. ....... 12

C. Plaintiffs have standing to pursue injunctive relief. ....... 14

D. Plaintiffs state their unjust enrichment claim. ....... 15

E. Plaintiffs sufficiently plead addiction. ....... 15

1. Well-supported facts form the addiction allegations. ....... 15

2. Plaintiffs do not assert any stand-alone claim for addictiveness. ....... 16

3. The First Amendment does not shield Defendant's deceptive marketing. ....... 17

F. California law applies to Plaintiffs' claims. ....... 17

II. Plaintiffs State Their VPPA Claims ....... 19

A. Plaintiffs adequately plead that their PII was impermissibly disclosed. ....... 19

B. Defendant's conduct cannot be characterized as "order fulfillment" or "request processing." ........ 21

C. Plaintiffs are VPPA "consumers." ........ 21

D. Defendant is a "video tape service provider." ........ 22

E. Plaintiff has standing to bring VPPA claims on a class-wide basis for Defendant's other mobile apps. ........ 23

CONCLUSION ........ 24


JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

# TABLE OF AUTHORITIES

## Cases

*Afriyie v. NBCUniversal Media, LLC*,
775 F. Supp. 3d 791 (S.D.N.Y. 2025) ........ 23

*Angelilli v. Activision Blizzard, Inc.*,
781 F. Supp. 3d 691 (N.D. Ill. 2025) ........ 17

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ........ 17

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ........ 15

*Azimpour v. Sears, Roebuck & Co.*,
2017 WL 1496255 (S.D. Cal. Apr. 26, 2017) ........ 12

*Ballard v. Insomniac Holdings, LLC*,
2025 WL 1696558 (N.D. Cal. June 17, 2025) ........ 22

*Branca v. Nordstrom, Inc.*,
2015 WL 10436858 (S.D. Cal. Oct. 9, 2015) ........ 12

*Branca v. Nordstrom, Inc.*,
2015 WL 1841231 (S.D. Cal. Mar. 20, 2015) ........ 9

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) ........ 20

*C.W. v. Epic Games, Inc.*,
2020 WL 5257572 (N.D. Cal. Sept. 3, 2020) ........ 13

*Campos v. Tubi, Inc.*,
716 F. Supp. 3d 623 (N.D. Ill. 2024) ........ 20, 21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) ........ 17

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ........ 9

*Delisle v. Speedy Cash*,
818 F. App'x 608 (9th Cir. 2020) ........ 18, 19

*Doe v. Epic Games, Inc.*,
435 F. Supp. 3d 1024 (N.D. Cal. 2020) ........ 13

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022) ........ 13, 14

*Doe v. Uber Techs., Inc.*,
184 F. Supp. 3d 774 (N.D. Cal. 2016) ........ 7, 11

*Evans v. DSW, Inc.*,
2017 WL 7058233 (C.D. Cal. Feb. 2, 2017) ........ 9, 12, 15

*Fan v. NBA Props. Inc.*,
2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) ........ 20

*Haley v. Macy's, Inc.*,
263 F. Supp. 3d 819 (N.D. Cal. 2017) ........ 11

*Hernandez v. Chewy, Inc.*,

2023 WL 9319236 (C.D. Cal. Dec. 13, 2023) ........ 23
*Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) ........ 9
*Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535 (9th Cir. 2021) ........ 15
*In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019) ........ 11
*In re Hulu Priv. Litig.*, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014). ........ 20
*In re Roger*, 2018 WL 1779336 (C.D. Cal. Apr. 12, 2018) ........ 8
*In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017 (N.D. Cal. 2021) ........ 10
*John v. AM Retail Grp., Inc.*, 2018 WL 1400718 (S.D. Cal. Mar. 20, 2018) ........ 8, 12, 24
*Khan v. Coinbase, Inc.*, 2025 WL 2985378 (Cal. Ct. App. Oct. 23, 2025) ........ 15
*Knapp v. Art.com, Inc.*, 2016 WL 3268995 (N.D. Cal. June 15, 2016) ........ 12
*LeGrand v. Abbott Lab'ys,* 655 F. Supp. 3d 871 (N.D. Cal. 2023) ........ 8, 10
*Mai v. Supercell Oy*, 2024 WL 2077500 (9th Cir. May 9, 2024) ........ 12, 13, 17
*Mai v. Supercell Oy*, 648 F. Supp. 3d 1130 (N.D. Cal. 2023) ........ 13
*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ........ 9
*Minor v. Favorite World, LLC*, 2024 WL 4834951 (C.D. Cal. Sept. 17, 2024) ........ 24
*Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007 (9th Cir. 2020) ........ 9
*Munning v. Gap, Inc.*, 2016 WL 6393550 (N.D. Cal. Oct. 28, 2016) ........ 12
*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992) ........ 18
*Ochoa v. Zeroo Gravity Games LLC*, 2023 WL 4291650 (C.D. Cal. May 24, 2023) ........ 14
*Rothman v. Equinox Holdings, Inc.*, 2021 WL 124682 (C.D. Cal. Jan. 13, 2021) ........ 10
*Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318 (9th Cir. 2012) ........ 18
*Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ........ 23
*Spann v. J.C. Penney Corp.*, 307 F.R.D. 508 (C.D. Cal. 2015) ........ 12

JANOVE PLLC
979 Osos St., Ste. A5, San Luis Obispo, CA 93401
500 7th Ave., 8th Fl., New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl., Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1103 (9th Cir. 2011) ... 9

*Susilo v. Wells Fargo Bank, N.A.*, 796 F.Supp.2d 1177 (C.D. Cal. 2011) ... 11

*Swearingen v. Santa Cruz Nat., Inc.*, 2016 WL 4382544 (N.D. Cal. Aug. 17, 2016) ... 9

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ... 8

*Vizcarra v. Michaels Stores, Inc.*, F. Supp. 3d, 2024 WL 64747 (N.D. Cal. Jan. 5, 2024) ... 8, 9

*Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906 (2001) ... 18

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ... 9

**Statutes**

Cal. Civ. Code §1776 ... 13

Cal. Civ. Code §770 ... 13

**Rules**

Fed. R. Civ. P. 9(b) ... 7

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Plaintiffs Cheryll Dougherty, Delia Camargo, and Lawrence Garcia ("Plaintiffs") oppose the motion, [D.E. 38] (the "MTD"), of Defendant Zynga, Inc. ("Zynga" or "Defendant") to dismiss Plaintiff's First Amended Complaint, [D.E. 33] (the "FAC"), as follows:

**INTRODUCTION**

The case involves rampant consumer fraud in Defendant's mobile games Toon Blast and Toy Blast (the "Games"). Through its patented technology, Defendant has fine-tuned its deceptive tactics to get individuals like Plaintiffs to spend exorbitant sums. Defendant makes $1 million a day from these supposedly "free to play" Games, which have likely netted more than $1 billion. *See* FAC ¶ 8. At its core, Defendant's strategy is no different than paradigmatic false advertising tricks adopted from brick-and-mortar stores to the in-app purchase context. Just like a person going to a mall or a department store to buy jeans and seeing advertisements of "LIMITED TIME SALE," or "40% OFF," a player of the Games will be bombarded with in-app offers claiming significant discounts and limited time sales or bonuses. Courts have repeatedly rejected arguments that a defendant is immune from liability simply because it deploys these predatory tactics in a digital forum. Plaintiffs adequately allege each of the core elements of their various consumer protection claims: Defendant made a variety of materially false and misleading statements; as Defendant intended, Plaintiffs relied on those statements in making in-app purchases they would not otherwise have made; and Plaintiffs were injured when Defendant took their money under false premises and caused them to lose money they would not have spent otherwise.

Not content to use deceptive marketing to make $1 million a day on in-app purchases alone, Defendant has also made a fortune violating the Video Privacy Protection Act ("VPPA") and monetizing its users' personal information and video viewing histories. Zynga incentivizes players of the Games to watch pre-recorded video advertisements, which provide a separate revenue stream from in-app purchases and are a significant source of revenue for Zynga. FAC ¶ 91. For instance, when users run out of moves to beat a level, they can watch video advertisements to get additional moves. FAC ¶ 92. Zynga estimates that 85% of Zynga gamers have been shown these videos, and it made $302.5 million in mobile game advertising revenue in 2020 alone. FAC ¶ 93, 95. Defendant practically admits to violating the VPPA. In addition to statements in privacy policies, user settings,

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

annual reports, and in promotional materials to its third party marketers, Zynga explicitly advises users in Toy Blast: "we may share your personal and in-game video viewing information with [ ] third parties"; and in Toon Blast, "we may share your personal and in-game video viewing information with [ ] third parties." FAC ¶¶ 118–19. The motion to dismiss should be denied.

**STATEMENT OF THE ISSUES TO BE DECIDED**

1. Whether Plaintiffs' allegations of fake discounts and false limited time sales adequately state claims under well-established California consumer protection law that recognizes such misrepresentations are unlawful and actionable.
2. Whether Plaintiffs state VPPA claims when Defendant essentially admits to sharing Plaintiffs' personal information and video view histories with third parties.

**BACKGROUND**

Defendant's Games are "tile matching" games, similar to Candy Crush. FAC ¶ 30. The Games are functionally identical. Users select groups of matching tiles in an attempt to clear the board before they run out of "moves" and lose a "life." *Id.* ¶¶ 30–32. Each Game has its own branding, but the gameplay and user experience take the same shape. *Id.* ¶ 33. And most importantly, Defendant employs identical deceptive business practices in both Games. *Id.* ¶ 33.

**I. Defendant's Deceptive Marketing Tactics**

The Games use a series of false and deceptive advertising tricks to artificially inflate the perceived worth of the bundle of items that players purchase. FAC. ¶ 39. Although deployed in a new digital context, these tactics mirror classic forms of false advertising. Players are presented with offers of limited time discounts or special sales. *Id.* ¶ 40. In fact, these supposedly discounted items are perpetually offered on discount and there are no competitors selling similar products for Toon Blast or Toy Blast, i.e. the "discount" or "sale" price is not actually discounted or on sale from any legitimate original price. *Id.* ¶ 41.

The FAC contains numerous examples of Defendant's false advertisements. *Id.* ¶¶ 44, 45, 48. In addition to fake "sales," the Games constantly bombard players with false reference pricing, which creates the illusion that the packs are worth more than the offered "sale" price. *Id.* ¶ 46. The Games advertise packs at huge discounts, often ranging from 60% to 90% "off." *Id.* But these packs

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

were never for sale at an original price that would support this calculation. *Id.*. Offers also frequently display countdown timers, creating the illusion of scarcity and of a limited-time offer in order to pressure players into making purchases. *Id.* ¶ 47.

**II. Defendant's Use Of Psychologically Manipulative Dark Patterns**

Defendant manipulates users in other ways that make them especially vulnerable to its deceptive advertising. The Games use a number of "dark pattern" psychological tactics to foster addiction and drive compulsive spending. FAC ¶ 4.[1] The Games themselves are designed to be addictive, constantly stimulating the brain's reward centers in the same manner as slot machines, including by providing "auditory and visual rewards for winning moves," offering "incremental rewards that reinforce 'correct' behavior," and creating "an illusion of control." *Id.* ¶ 70. Defendant then implements another layer of addictive game design by offering microtransactions, *i.e.* items for sale at small amounts but at high velocity and frequent intervals, so that Defendant can take advantage of and foster addictive tendencies with respect to the transactions themselves. *Id.* ¶ 71. These increase the likelihood of problematic microtransaction purchase behavior and problem gambling symptoms through reinforcement. *Id.* ¶ 71.

Once addicted, players of the Games find that successive levels become more and more difficult to complete without the purchase and use of in-game items. *Id.* ¶ 56. As noted by a Reddit user (and experienced Toon Blast player): "it should be possible to beat [a level] without the use of boosters, ads, coins, etc. But some levels are, for practical purposes, not beatable without these add-ons." *Id.* As each level becomes increasingly more difficult, and users are unable to complete a level, the Games pressure players into buying extra moves. *Id.* ¶ 59. For example, the Games cause players to fear the loss of their winning streaks or competitions (and promised rewards) if they decide not to make the purchase. *Id.* ¶ 59.

Defendant has even patented various technologies it has invented to keep individuals hooked

[1] "Dark patterns" are manipulative design practices, such as those identified by the Federal Trade Commission ("FTC") in its September Sept. 14, 2022 report "Bringing Dark Patterns to Light," available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

on the Games and spending money. *Id.* ¶¶ 78–85. It develops models to predict which users are likely to spend money, how much money they are likely to spend, and what type of false or misleading advertising will maximize revenue. *Id.* ¶ 78. For instance, Defendant's Patent No. 10,482,100 details Defendant's "prediction model generator" that "generates a model to predict the likelihood of a player making a purchase or payment in the game," and then pairs it with a recommendation model to trick players into spending more. *Id.* ¶ 78. For "likely buyers," Defendant's model recommends that "in-game personalization may be used to aggressively target revenue features (e.g. flash sales, etc.)" and by "showing a discount offer to Likely Buyers 2x more often as compared to that shown for Non Likely Buyers." *Id.*

Defendant also deploys a pattern of fake discounts to sell items at a price and at a specific discount percentage tailored to each user. FAC ¶ 82. As Defendant's Patent No. 103,69,475, entitled "Customized offers for sales of combinations of virtual items," explains, Zynga has developed a model to choose the discounts and sales that it believes will appeal best to each user. *Id.* ¶ 82. Zynga openly admits the presentation is deceptive: "The presenting suggests that the combination of virtual items is randomly selected from a set of virtual items or that the discounted price is randomly selected from a set of discounted prices. However, in actuality, the combination of virtual items or the discounted price may not be selected randomly." *Id.* ¶ 83. Rather, games using this technology create bogus discounts tailored to individual players to maximize the chance players will make those purchases. *Id.* ¶ 84. Specifically, Defendant employs an "offer-generation module" that uses a variety of data points about an individual user to present a "sale" that is most likely to cause the player to make a purchase, including "the combinations of virtual items and discount percentages that are most likely to increase revenues received by an operator of the game networking system." *Id.* ¶ 85. Defendant uses these inputs to determine the distribution of discounts "that maximizes the revenues received." *Id.*

## III. Defendant Tracks Its Users And Makes Huge Profits Selling Their PII Without Consent

Zynga incentivizes players of the Games to watch pre-recorded video advertisements, which provide a separate revenue stream from in-app purchases and are a significant source of revenue for

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

Zynga. FAC ¶ 91. For instance, when users run out of moves to beat a level, they can watch video advertisements to get additional moves. *Id.* ¶ 92. Zynga estimates that 85% of Zynga gamers have been shown these videos, allowing it to make $302.5 million in mobile game advertising revenue in 2020. *Id.* ¶¶ 93, 95. In its 2020 Annual Report, Zynga explains how it leverages the expansive data it captures from its players to monetize their games, including through advertising:

> At the core of Zynga's live services platform is our first-party data network, which captures key insights about how our players are interacting with our games. We use this data to deliver highly engaging interactive experiences for our players, optimize our user acquisition and determine how to best monetize our games, including advertising. By leveraging the scale of our audience base and investing in additional advertising technologies and solutions, we have the ability to expand our access to advertising data and unlock more value from Zynga's network of games.

To this day, video advertising remains central to Zynga's strategy to profit from its mobile applications, including the Games. *Id.* ¶ 100. It maintains a website dedicated to promoting advertising to third parties, https://www.zyngaads.com/. *Id.*

Zynga has also bragged how its "[t]argeting capabilities in mobile games are extensive," explaining that Zynga "think[s] about targeting data in three buckets: demographics, interest and purchase intent. . . . Whether it's first-party, second-party, third-party data or contextual, you will have to use all of them to maximize reach." *Id.* ¶ 110. Zynga's Privacy Policy reveals how it performs this "targeting," and admits that Zynga shares a wide range of PII and a user's game activity with third parties. *Id.* ¶ 111. For instance, Zynga collects:

> **Identifiers / Contact Information**: Name, user name, gamertag, postal and email address, phone number, unique IDs, mobile device ID, platform ID, gaming service ID, advertising ID (IDFA, Android ID) and IP address . . .
>
> **Internet / Electronic Activity**: Web / app browsing and gameplay information related to the Services; information about your online interaction(s) with the Services or our advertising; and details about the games and platforms you use and other information related to installed applications . . .
>
> **Device and Usage Data** "device type, software and hardware details, language settings, browser type and version, operating system, and information about how users use and interact with the Services (e.g., content viewed, pages visited, clicks, scrolls)." FAC ¶ 112.

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

Zynga even admits it creates a "personalized profile" of its users:

> **Profile Inferences**: Inferences made from your information and web activity to help create a personalized profile so we can identify goods and services that may be of interest. FAC ¶ 113.

Finally, Zynga admits that "we share your information with . . . advertising service providers and third-party advertising partners," and that it "has sold and/or shared unique identifiers, IP address, as well as Internet/Electronic Activity and Profile Inferences with third-party advertising providers to enable us to provide personalized advertising . . . . " *Id.* ¶ 114–115.

Separate from the Privacy Policy, Zynga even recently directly admitted to Toon Blast and Toy Blast players that it shares their PII and video viewing history, consistent with the above statements. *Id.* ¶ 118 (Toon Blast Pop-up stating that Zynga "share[s] your personal and video viewing information with" third parties), ¶ 119 (similar disclosure for Toy Blast).

## IV. Plaintiffs Fall Prey to Defendant's Unlawful Tactics

Plaintiff Cheryll Dougherty is a California resident who currently plays the Toon Blast game and previously played the Toy Blast game. FAC ¶ 12. When she played Toy Blast, Plaintiff Dougherty frequently made in-app purchases of the various types of packs and sale items because of Defendant's deceptive advertising and illegal marketing tactics. FAC ¶ 12, App'x A.

Plaintiff Delia Camargo is also California resident who plays the Toon Blast game, so much so that she felt addicted and compelled to play Toon Blast, even losing sleep playing it. For over 8 years, including until about a year ago, she estimates spending upwards of two to three hours each day playing the game, every day of the week. In Toon Blast, Plaintiff estimates spending over $1,000 spread across frequent in-app purchases, which included purchases of the various types of packs and sale items described below, including packs that were advertised as being on sale or purporting to advertise massive discounts. FAC ¶ 13.

Plaintiff Lawrence Garcia was a California resident until August 2024. FAC ¶ 14. Like the other Plaintiffs, Garcia found the app addictive and spent hundreds of dollars across frequent in-app purchases on packs purporting to advertise massive discounts. FAC ¶ 14. He also watched pre-recorded video content in the Toon Blast game, including watching video advertisements to advance in the Toon Blast game and to collect additional items and rewards. FAC ¶ 15.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Because of Defendant's false and misleading advertising and sales tactics, and intentionally addicting game design, all Plaintiffs made in-app purchases in the Games at higher prices and at higher frequencies than they otherwise would have. FAC ¶ 16. These in-app purchases included items or packs that were falsely advertised as on limited-time sales or discounted, as illustrated above. FAC ¶ 16. And because of Defendant's unlawful tactics, designed to pressure Plaintiffs into making a rapid series of small purchases, Plaintiffs cannot recall the specific details of every false advertisement or purchase, although each Plaintiff recalls purchasing packs based on the deceptive advertising described below. FAC ¶ 16.

The same is true with respect to video advertisements. FAC ¶ 16. When players, including Plaintiffs Dougherty and Garcia, watched video advertisements in the Games, their PII and video viewing history were shared with third parties, including Zynga's advertising partners, so that Zynga could profit from selling targeted advertising. FAC ¶¶ 88–122.

## LEGAL STANDARDS

"In deciding whether a plaintiff has stated a claim upon which relief can be granted," the Court assumes "the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor." *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 781 (N.D. Cal. 2016) (Illston, J.).

## ARGUMENT

### I. Plaintiffs Have Adequately Stated Their Consumer Protection Claims

Plaintiffs assert various claims under state consumer protection laws and common law, arising from Defendant's false advertising and deceptive statements alleged in the FAC. These include California's False Advertising Law ("FAL"), California's Unfair Competition Law ("UCL"), California's Consumers Legal Remedies Act ("CLRA"), fraud, and unjust enrichment. For the reasons below, Plaintiffs have stated each of these claims.

#### A. Plaintiffs satisfy Rule 9(b).

Rule 9(b) requires plaintiffs asserting claims sounding in fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The objective of this particularity requirement is to make the pleading "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Allegations like the period when the items were purchased, the source from which they were purchased, a description of the items, a description of the relevant advertising, and pictures depicting them have been held to be sufficient to satisfy Rule 9(b). *John v. AM Retail Grp., Inc.*, 2018 WL 1400718, at *7 (S.D. Cal. Mar. 20, 2018); *see also LeGrand v. Abbott Lab'ys,* 655 F. Supp. 3d 871, 895 (N.D. Cal. 2023) (denying motion to dismiss based on 9(b) because plaintiff alleged the class period was the relevant time in which she purchased the products, relying on the relevant advertisements, that they were misleading, and why); *In re Roger*, 2018 WL 1779336, at *3 (C.D. Cal. Apr. 12, 2018) ("The requirements of Rule 9(b) may be relaxed as to matters peculiarly within the opposing party's knowledge") (cleaned up).

Where, as here, a plaintiff alleges a "blanket" practice, "[e]ven under Rule 9(b), there is no reason to require [plaintiff] to individually investigate and track the prices of every [] product" because the allegations "would clearly apply to all [] products during the investigated time period." *Vizcarra v. Michaels Stores, Inc.*, F. Supp. 3d, 2024 WL 64747, at *7 (N.D. Cal. Jan. 5, 2024) (plaintiffs adequately alleged FAL, UCL, and CLRA claims based on falsely advertised 20% discount). Likewise, identifying specific transactions or dates is not necessary as long as the plaintiff plausibly alleges a class period and that they made relevant purchases during that class period. *See LeGrand*, 655 F. Supp.3d at 895 (collecting cases).

The FAC contain detailed allegations and screenshots that specifically describe the various types of deceptive statements Defendant presented to the named Plaintiffs during the time periods at issue, as detailed below. Nothing more is required to satisfy Rule 9(b).

**B. Plaintiffs adequately allege their consumer protection claims.**

Plaintiffs' consumer protection claims universally ask Plaintiffs to adequately allege (a) some false, misleading, or otherwise deceptive statement or conduct, in some cases an advertisement, (b) directed to consumers who were materially misled by the statement or conduct, and that (c) caused an injury to Plaintiffs.

**1. Plaintiffs plead materially misleading false and deceptive advertising.**

"Claims under the FAL, UCL, and CLRA 'are governed by the 'reasonable consumer' test.'"

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

*Vizcarra*, 2024 WL 64747, at *6 (quoting *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). Accordingly, "the plaintiff must allege the defendant's purported misrepresentations are likely to deceive a reasonable consumer." *Branca v. Nordstrom, Inc.*, 2015 WL 1841231, at *6 (S.D. Cal. Mar. 20, 2015) (citing *Williams*, 552 F.3d at 938). Additionally, "[a]ny violation of the [FAL] . . .necessarily violates the [UCL]." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020). Importantly, "whether a business practice is deceptive will usually be a question of fact not appropriate for decision on a [motion to dismiss]." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) (alteration in original); *see Swearingen v. Santa Cruz Nat., Inc.*, 2016 WL 4382544, at *8 (N.D. Cal. Aug. 17, 2016) (Illston, J.) ("California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer.").

**2. Plaintiffs adequately plead injury and have standing.**

In the context of false advertising and equivalent claims, the Ninth Circuit has held that consumers suffer an injury-in-fact for Article III standing purposes when they purchase a product because of the advertising and "paid more for [the product] than they otherwise would have paid, or bought it when they otherwise would not have done so." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013). In other words, if Plaintiffs allege they "were relieved of their money by [defendants'] deceptive conduct … they have suffered an 'injury in fact.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1103, 1021 (9th Cir. 2011)).

As detailed above, Plaintiffs have adequately alleged an injury through the purchase of game packs caused by relying on Defendant's misrepresentations. This is "all that is required at the pleading stage." *Evans v. DSW, Inc.*, 2017 WL 7058233, at *7 (C.D. Cal. Feb. 2, 2017) (holding that plaintiff had established standing under Article III and the UCL, FAL, and CLRA, observing that "[t]aking Plaintiff's allegations as true, as the Court is obligated to do, she has adequately plead that she suffered an injury-in-fact because she purchased the shoes in reliance on DSW's allegedly

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

fraudulent misrepresentations").[2]

Defendant's suggestion that Plaintiffs Camargo and Garcia have not sufficiently alleged standing because they did not provide a list of specific transactions (like the partial list Plaintiff Dougherty found) is not supported by any authority. *Rothman v. Equinox Holdings, Inc.*, 2021 WL 124682, at *5 (C.D. Cal. Jan. 13, 2021), cited by Defendant, only serves to confirm that Plaintiffs allegations here are sufficient. That case involved a misleading "refund policy." *Id.* The plaintiff did "not allege that he saw, read, or was informed of this statement or otherwise relied on it before deciding to purchase his Equinox club membership," and the Court therefore found the complaint did not adequately plead reliance. *Id.* Here, each Plaintiff alleges that she or he repeatedly viewed and relied on specific misstatements made by Defendant, including false discounts and false countdown timers. *See, e.g.*, FAC ¶ 12 (Dougherty purchased "the various types of packs and sale items described below including at least $279 on various 'Special Offer' packs and at least $132 on the 'Toy Bundle."); *id.* ¶ 13 (Camargo purchased "various types of packs and sale items described below, including packs that were advertised as being on sale or purported to advertise massive discounts.").[3]

Defendant's reliance on *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1046 (N.D. Cal. 2021) is equally misplaced. The allegations there were held insufficient because "Plaintiffs merely 'identify[ ] the statements on Zoom's website and privacy policy that are reasonably likely to mislead'" but "[n]o Plaintiff allege[d] reading those allegedly misleading statements, let alone reading them at a specific time or place." By contrast, Plaintiffs here allege that they were bombarded with Defendant's false advertisements every time they played. The FAC

---

[2] Further, Plaintiffs have standing to assert claims against Defendant on behalf of the proposed classes because the FAC plausibly allege that unnamed class members were injured by misrepresentations and purchased products that "are substantially similar" to the ones they purchased. *LeGrand*, 655 F. Supp. 3d at 886.

[3] While the *Rothman* plaintiff argued that "he has pleaded injury-in-fact by pleading that he viewed and relied upon Defendant's refund guarantee" and that the complaint alleges that plaintiff "relied on Defendant's misrepresentations when deciding whether to purchase the membership Agreement," the Court reviewed the Complaint and found that it did not contain any such allegations, but only a statement that "Consumers, including plaintiff and members of the Class, necessarily and reasonably relied on Defendant's statements regarding the Membership Agreement's refund policy." *Rothman*, 2021 WL 124682, at *5.

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
500 7th Ave., 8th Fl.
New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

contains detailed allegations and screenshots that specifically describe the various types of deceptive statements Defendant presented to the named Plaintiffs during the time periods at issue, as detailed above. Nothing more is required to satisfy Rule 9(b). In addition, with the information Plaintiffs have provided, Defendant is better positioned to determine exactly which of their many deceptive advertisements were shown to Plaintiffs and on which exact date. *Uber Techs.*, 184 F. Supp. 3d at 790 (finding Rule 9(b) satisfied because "plaintiffs cite to statements that Uber should readily have in its possession and be able to identify") (citing *Susilo v. Wells Fargo Bank, N.A.*, 796 F.Supp.2d 1177, 1191 (C.D.Cal.2011)) ("the requirement is relaxed where 'the defendant must necessarily possess full information concerning the facts of the controversy,' ... or 'when the facts lie more in the knowledge of the opposite party[.]'").

*In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1171 (N.D. Cal. 2019) is also inapposite. Plaintiffs there claimed they were deceived about the use of throttling software and battery issues, and included specific allegations about (a) the device used; (b) the date of purchase; and (c) the software versions used, but did not "plead which representations any individual plaintiff was exposed to or relied on." *Id*. Here, the FAC contains a lengthy recitation of the representations that Plaintiffs were "exposed to and relied on," including for Plaintiff Dougherty the specific dates on which some of her transactions were made. *See* FAC App'x A (list of specific transactions that she made as a result of Defendant's deceptive marketing tactics).

And *Haley v. Macy's, Inc.*, 263 F. Supp. 3d 819, 823 (N.D. Cal. 2017) again only highlights why Plaintiffs allegations here are more than adequate. The Court there found the complaint did not allege details "about specific purchases," *or* "categorically allege that all of Defendants' products are misleadingly priced, but rather concede[d] some prices may not be false or deceptive." The FAC alleges that Defendant bombards *all* players with the same false and deceptive advertising. FAC ¶ 4 ("Players of the Games are constantly bombarded with materially false and misleading offers for in-game purchases."); ¶ 55 ("[T]hese deceptive practices are used constantly in the Games."). Defendant's pervasive and targeted in-app advertising has nothing in common with Macy's advertisement in a physical store that a consumer may or may not see, and the FAC clearly alleges that Defendant shows these same misleading advertisements to all players, including Plaintiffs.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Also, unlike here, the complaint listed samples of misleading advertisements but "when explaining why they made their respective purchases at Macy's, Plaintiffs only generically refer to "advertisements" or "advertising." Plaintiffs here specify the exact types of false advertising Defendant used to induce them to make purchases. FAC ¶¶ 12-14.

The Ninth Circuit's decision in *Mai v. Supercell Oy*, 2024 WL 2077500, at *1 (9th Cir. May 9, 2024) also has no bearing on this case. *Mai* addressed claims related to "loot boxes," which are "in-game transactions through which a player purchases a mystery item or items." *Id*. None of Plaintiffs' claims here related to "loot boxes" or contend that they were deceived about the *contents* of the item bundles. Rather, Plaintiffs allege that Defendant used a variety of classic false discounting tactics to deceive them about the *value* of the items purchased, tricking them into believing the items were normally sold at a higher price and were being offered at a discount. False "discounting" is a classic and well-established basis for the consumer claims asserted by Plaintiffs. *See, e.g.*, *Knapp v. Art.com, Inc.*, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016) (denying motion to dismiss FAL §§ 17500 and 17501 false advertising claims as distinct theories of liability based on website's false claims of 40% off); *Evans,* 2017 WL 7058233, at *7–11 (false claims of "Compare at" reference price); *Munning v. Gap, Inc.*, 2016 WL 6393550, at *4–5 (N.D. Cal. Oct. 28, 2016) ("websites listed crossed-out prices followed by a percentage discount and a new price"); *Spann v. J.C. Penney Corp.,* 307 F.R.D. 508, 513 (C.D. Cal. 2015), *modified*, 314 F.R.D. 312 (C.D. Cal. 2016) (false claims of 40% off original price); *John v. AM Retail Grp., Inc.*, 2018 WL 1400718, at *7 (S.D. Cal. Mar. 20, 2018) (false 60% off sale); *Branca v. Nordstrom, Inc.*, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015) (false claims of "Compare at" reference price); *Azimpour v. Sears, Roebuck & Co.*, 2017 WL 1496255, at *7–8 (S.D. Cal. Apr. 26, 2017) ("discount" price advertised next to false "regular price").

**3. The CLRA covers Defendant's in-game sales.**

Defendant makes the metaphysical argument that the packs available for sale in their games, purchased with real money, are not "a good or service as defined in the" CLRA. MTD at 8.

The CLRA prohibits unfair competition and deceptive practices "in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

§770(a). Defendant is correct that "goods" in the CLRA refers only to "tangible chattels," but that is as far as the argument can carry them. Defendant quotes the definition of "goods" but ignores the definition of "services" in the CLRA. Presumably because that term easily encompasses apps like Defendant's as an entertainment service, as it covers "services for other than a commercial or business use," like the personal enjoyment of a game on one's mobile device. Cal. Civ. Code §1776(a) & (b); *see Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1263 (N.D. Cal. 2022) ("Roblox provides users access to its metaverse, which is comfortably classified as an online entertainment service."). In-app purchases like game packs are "transaction[s] . . . to make use of a part of that entertainment service," and therefore fall within the scope of services under the CLRA. *Id.* In the FAC, Plaintiffs allege that the in-game packs (and indeed, the games themselves) are *either* a good or a service "within the meaning of Cal. Civ. Code. §§ 1761(a) and (b)." FAC ¶ 213.

Although some early decisions held that in-app purchases do not fall within the ambit of the CLRA, they are distinguishable and do not reflect the current state of the law. In *Doe v. Epic Games, Inc.*, the Court dismissed the plaintiff's proposed class action claims under the CLRA relating to the purchase of in-app "digital content" in the game Fortnight. *See Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (cited in MTD at 9). However, the in-app purchases in that case could not be made directly with real money. Instead, players had to buy virtual currency, which could then be used to make in-app purchases. *Epic Games,* 435 F. Supp. 3d at 1046. No such intermediate transaction exists in this case, because game bundles are purchased directly with real money. This is precisely the kind of transaction related to use of a service that the CLRA and other consumer protection laws are designed to cover. In this respect, Defendant's citation to the now-vacated district court decision *in Mai v. Supercell Oy*, is inapposite as it relied on *Epic Games* and dealt with the purchase of virtual currency, not in-game items purchased with actual money. *See Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1136 (N.D. Cal. 2023), *vacated and remanded*, No. 23-15144, 2024 WL 2077500 (9th Cir. May 9, 2024).

Moreover, Judge Gonzalez Rogers also declined to follow her own prior *Epic Games* decision in a later decision related to the Fortnite game. *C.W. v. Epic Games, Inc.*, 2020 WL 5257572, at *4 (N.D. Cal. Sept. 3, 2020) (Gonzalez Rogers, J.). In that case, the Court tentatively

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

concluded it was "plausible" that the game "may be a cross-over product"—meaning an entertainment service and not merely software—subject to the CLRA, and that dismissal should not occur "absent a full record . . ." *Id.* Just like with *Epic Games*, as courts have continued to grapple with deceptive business practices in digital gaming, the weight of case law has shifted towards Plaintiffs' position: gaming apps are entertainment services, in-app purchases are a part of that entertainment service, and thus are covered by the CLRA. *See, e.g.*, *Ochoa v. Zeroo Gravity Games LLC*, 2023 WL 4291650, at *13 (C.D. Cal. May 24, 2023) (false advertised discounts in mobile game constitute a "good or service" under the CLRA "[i]n light of the CLRA's underlying purpose to protect consumers and the liberal construction with which courts should interpret it"); *Roblox*, 602 F. Supp. 3d at 1263–64 ("[W]hen a consumer buys in-game currency, she is engaging with the online entertainment service in one of the key ways consumers are intended to. That transaction is at the core of the 'service.'").

**C. Plaintiffs have standing to pursue injunctive relief.**

Plaintiffs allege that they are addicted to the Games, "play and/or may still play the Games and be deceived and pressured into making in-app purchases." FAC ¶ 203. Plaintiff Dougherty alleges she specifically still plays Toon Blast twice a week. *Id.* ¶ 12. Read in the context of the FAC's detailed allegations concerning the addictive nature of the Games and the constant presentation of targeted misleading false-advertising, this is not a "vague" allegation. MTD at 9. Rather, all Plaintiffs hope they will not fall prey to Defendant's deceptive advertising, but face a serious and present risk that they will be unable to resist based on Defendant's high pressure and manipulative sales tactics and addictive game design. FAC ¶ 75. And although Plaintiffs may now be able to identify certain "sales" and "discounts" they have previously viewed as deceptive, it does not follow that they have become experts in identifying every different and targeted way that Defendant may present them with deceptive future advertising. Again, Defendant employs an "offer-generation module" that uses a variety of data points about an individual user to present a "sale" that is most likely to cause the player to make a purchase, including "the combinations of virtual items and discount percentages that are most likely to increase revenues received by an operator of the game networking system." FAC ¶ 85. Defendant's technologies will continue to try

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

to find the right combination of tactics and artificial discount to pressure Plaintiffs and the public into making additional purchases.

The injunction Plaintiffs seek also satisfies the standards for providing a public benefit and not only a private one. The very case Defendant relies on, *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021), describes an "injunction against the use of false advertising" as the "paradigmatic example" of public injunctive relief. Defendant's "free" gaming applications are "accessible and available to the general public" and Plaintiffs seek relief that would require Defendant to change the manner in which it discloses its prices and fees to all customers on the app," therefore it "would benefit the public as a whole." *Khan v. Coinbase, Inc.*, 2025 WL 2985378, at *9 (Cal. Ct. App. Oct. 23, 2025) ("[T]he allegedly unlawful business practices Khan seeks to enjoin pertain to Coinbase's continuing operation of an online currency exchange that is accessible and available to the general public. The relief he seeks would require Coinbase to change the manner in which it discloses its prices and fees to all customers on its Simple Trade platform. If Khan can prove his substantive claims, the injunctive relief he seeks under the UCL and FAL would benefit the public as a whole, and for that reason he may pursue his claims in the superior court.")

**D. Plaintiffs state their unjust enrichment claim.**

For the same reasons laid out above, Plaintiffs have adequately stated claims for unjust enrichment. Defendant has unjustly received and retained the benefit of Plaintiffs' pack purchases through "mistake, fraud, coercion, or request." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Allegations of false and deceptive discounting—in particular involving "made-for-outlet" goods that could not be purchased elsewhere—are sufficient to state a claim for unjust enrichment *along with* statutory consumer claims. *Evans*, 2017 WL 7058233, at *2 & *11.

**E. Plaintiffs sufficiently plead addiction.**

Defendant takes issue with three aspects of Plaintiffs' "Addiction Allegations," claiming they are not "pled with specificity," cannot be stand-alone causes of action, and are protected by the First Amendment. MTD at 10–11. None of these arguments are well-founded.

**1. Well-supported facts form the addiction allegations.**

The FAC contains extensive factual allegations concerning how Defendant uses what the

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

FTC refers to as "dark patterns," i.e. psychologically manipulative sales tactics, to foster addiction and drive in-app purchases. FAC ¶¶ 69-87 (explaining the specific game features that drive addiction with citations to scientific literature, and identifying specific Zynga patents that it uses to creative addictive behaviors and prime users for deceptive marketing). It also contains specific allegations about how these tactics affected Plaintiffs, who all allege they became addicted to the games. Dougherty spent upwards of four to five hours a day on Toy Blast, spending nearly all her free time on the game. FAC ¶ 12. Plaintiff Camargo spent two to three hours a day playing Toon Blast every day of the week, and even lost sleep playing it. *Id.* ¶ 13. Plaintiff Garcia played it from morning through night, and consistently played Toon Blast from five to nine hours a day. *Id.* ¶ 15. It is hard to even understand what Defendant means by arguing that these allegations "bear no relation to" the allegations concerning their deceptive advertising. MTD at 11. As but one example, the FAC explains how "by tricking players into making many smaller, time-sensitive purchases of purportedly high-value packs that are nominally on "sale" or heavily discounted for a limited time, Defendant deliberately fosters addictive behaviors and lures consumers into dangerous spending habits—similar to a gambling addiction." FAC ¶ 72; *see also id*. FAC ¶ 73 ("Defendant also fosters addiction by offering a shifting catalogue of deceptive sales. Players are unsure whether and how often the 'sales' will be repeated. Variable rewards, meaning positive results that manifest with unknown likelihood, are a staple of addictive video game design.").

**2. Plaintiffs do not assert any stand-alone claim for addictiveness.**

Plaintiffs UCL, FAL and CLRA claims are based on Defendant's deceptive sales tactics, which use digital means to mirror various false discounting tactics that have long been held unlawful under these statutes. The addictive nature of Defendant's gaming application is relevant to these allegations because—as explained in Defendant's own patents—its psychologically manipulative tactics make consumers more likely to fall prey to its deceptive marketing by creating pressure to purchase the items so they can advance in the Games. FAC ¶¶ 76–87. This compounds and reinforces the deceptive and unfair nature of Defendant's false discounting.[4] Plaintiffs do not allege

[4] For example, the FAC alleges at ¶¶ 82–83: Defendant has "perfected its pattern of fake discounts to sell items at a price and at a specific discount percentage tailored to each user. As Defendant's

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

any stand-alone causes of action based solely on addictiveness so there is nothing to dismiss. *Cf. Mai*, 648 F. Supp. 3d at 1136 ("Claim 1 asserts that Supercell violates the unlawful prong of the UCL by possessing or operating games containing loot boxes in violation of various state and federal gambling statutes.")

**3. The First Amendment does not shield Defendant's deceptive marketing.**

Defendant's use of dark patterns and psychologically manipulative design tactics to pressure players into making in-app purchases based on the false advertisements is exactly the type of speech that courts have repeatedly concluded does not merit protection under the First Amendment. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1119 (9th Cir. 2021) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."). The cases Defendant relies on do not hold otherwise, and involve the presentation of content that was not alleged to be false or unlawful. None of those authorities suggest that design features that push deceptive marketing on users are somehow protected by the First Amendment. *See, e.g., Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 700 (N.D. Ill. 2025) ("[M]ost of Plaintiffs' claims require them to prove that Roblox has addictive properties").

**F. California law applies to Plaintiffs' claims.**

California law should apply to claims brought by California residents against a company headquartered in California based on deceptive practices that occurred in this state.[5] Indeed, Zynga does not dispute that the claims arose entirely in California and begins by making various arguments under California law. MTD at 1-12. Nonetheless, Defendant argues that the Court should allow it to evade responsibility for its actions in California because it imposed a New York choice of law clause on its consumers in an adhesive click-wrap agreement. MTD at 13-14; *see* Opposition to

Patent No. 103,69,475, entitled "Customized offers for sales of combinations of virtual items," explains, Zynga has developed a model to choose the discounts and sales that it believes will appeal best to each user. Zynga openly admits the presentation is deceptive: "The presenting suggests that the combination of virtual items is randomly selected from a set of virtual items or that the discounted price is randomly selected from a set of discounted prices. However, in actuality, the combination of virtual items or the discounted price may not be selected randomly."

[5] Plaintiff Garcia has since moved out of state, but that does not change the analysis.

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

MTC Part I.

Under California's choice of law rules, before enforcing a choice of law clause the Court must first consider whether the selected state "has a substantial relationship to the parties or their transaction, or . . . whether there is any other reasonable basis for the parties' choice of law." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323 (9th Cir. 2012) (alteration in original) (quoting *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992)). Defendant does not articulate any substantial relationship between New York and the parties or their transaction, or any other reasonable basis for its choice of New York law. The only relationship mentioned in the MTD is that "Zynga and Take-Two have a reasonable basis to choose the laws of the state where Take-Two is headquartered to apply." MTD at 14. But Take-Two is not a party to this litigation. Take Two is not directly responsible for the Games—Zynga is. FAC ¶¶ 17–18, 20–26. Defendant cites no authority suggesting that a corporate parent's headquarters, as opposed to the entity that is a party to the case and is directly responsible for the misconduct at issue, is enough to show a reasonable basis for selecting and otherwise unrelated state's law. That is not surprising since the location where Defendant's parent company is headquartered has no relationship whatsoever with this dispute over actions that occurred entirely in California, between California parties.

Because Defendant cannot even satisfy the first requirement the Court need not perform the next step of the choice of law analysis, but Defendant's arguments would fail there as well. Even if the designated state has a substantial relationship to the parties or their transaction (as New York does not here), the Court "may not enforce the choice of law provision if (1) the substantive law of [New York] is 'contrary to a fundamental policy of California' and (2) California has a 'materially greater interest' than New York in resolving the issue." *Delisle v. Speedy Cash*, 818 F. App'x 608, 611 (9th Cir. 2020) (quoting *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 103 (2001)). Here, Defendant claims that New York law would bar Plaintiffs' claims, MTD at 15—so New York law is contrary to a fundamental policy of California, as reflected in California's consumer protection statutes. *Delisle*, 818 F. App'x 608, 611 (choice of Kansas law was contrary to a fundamental policy of California, as California law "invalidates contractual waivers of the right to seek public injunctive relief in all forums"). It also has a materially greater interest than New York

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

in resolving claims between California parties about conduct that occurred in California, as well as preventing California companies from evading responsibility for violations of California law through the use of adhesive choice of law provisions that allow them to choose the law of other states instead. *See id*. (California had a materially greater interest, when "parties negotiated and executed the contracts in California, Plaintiffs reside in California, and [Defendant] has over thirty stores in California" despite Defendant itself, and not only its parent, being headquartered in the state whose law it sought to apply).

**II. Plaintiffs State Their VPPA Claims**

Defendant argues that Plaintiffs' VPPA claim should be dismissed based on Defendant's unsubstantiated factual assertions about how their app works. MTD at 16 ("To understand why Plaintiffs' VPPA claims fail one must understand how third-party advertisement work in Toon Blast"). On this motion to dismiss, the Court's role is not to make a determination about how third-party advertisement worked in the app, much less accept Defendant's self-serving descriptions of how it worked over Plaintiffs' allegations to the contrary. All of Defendant's arguments invert the motion to dismiss standards, and fail accordingly.

**A. Plaintiffs adequately plead that their PII was impermissibly disclosed.**

The FAC contains multiple quotations from Defendant's own privacy policy and Annual Reports describing how it collects and impermissibly discloses users personally identifiable information ("PII"). FAC ¶¶ 91–121. Defendant argues that Plaintiff "falls to allege any nexus between those disclosures and Toon Blast itself" implying that they relate to other Zynga products. MTD at 18 (Privacy Policy "may apply to many products . . . without each part of the privacy notice applying to each use case.") But the FAC does allege facts showing a nexus, including a specific pop-up displayed to Toon Blast and Toy Blast users stating that Zynga "share[s] your personal and video viewing information with third party services for advertising and analytics purposes," FAC ¶¶ 118–119, and a statement "in the Toon Blast privacy center" that states "in order to personalize ads, we allow certain online advertising partners to collect information about you, e.g. profile information you provide us, your device Advertising ID and other device information." *Id*. ¶ 121. The FAC also alleges how Zynga extensively tracks user activity and shares it with its third party

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

marketers for personalized and targeted advertising.

Zynga can endeavor through discovery to show that it has not shared Plaintiffs' PII in the manner stated, but the FAC contains more than enough information to state a VPPA claim: Zynga explicitly admits to sharing personal information and video viewing history with third parties. That is more than sufficient at the motion stage to plausibly state a VPPA violation. *Fan v. NBA Props. Inc.*, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024) (Illston, J.) (listing elements to state a VPPA claim, including alleging that "defendant disclosed 'personally identifiable information concerning any customer' to 'any person.'").[6] And if this admission of liability was not sufficient, Plaintiffs' additional allegations about how Defendant engages in targeted video advertising and shares information about its users to third-party marketers, and that Defendant makes substantial profit off of sharing this information, constitute "circumstantial evidence to infer that [Defendant] disclosed customer information in a non-VPPA-complaint manner." *See Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *4 (N.D. Ill. June 4, 2024) ("Here, the Annual Reports, the privacy policy, and the press report offer sufficient circumstantial evidence to infer that Fubo disclosed customer information in a non-VPPA-compliant manner"); *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 639 (N.D. Ill. 2024) ("Campos does not need a 'smoking gun' in her complaint. The relevant pieces of circumstantial evidence, such as Tubi's own words saying that it might engage in various aspects of the accused conduct, in conjunction with the other factual allegations about Tubi's practices, its emphasis on hyper-specific ad targeting, and business model—some supported by suggestive documentary evidence—are sufficient to support the plausibility of Campos's claim."). For instance, Zynga's Privacy Policy reveals how it performs this "targeting," and admits that Zynga shares a wide range of PII and a user's game activity with third parties. FAC ¶ 111. For instance,

[6] Similarly, Defendant's unsubstantiated assertions that despite what is stated in its policies and pop-ups, "Toon Blast does not collect" this type of information, MTD at 19, are not properly before the Court on this motion to dismiss. The reasonable inference from Plaintiffs' detailed and factual allegations is that Zynga does collect it in Toon Blast. Defendant will have the opportunity to disprove that allegation in discovery if they can.

Nor are Plaintiffs required to show that "the disclosure has to be the person's actual name.…The statute does not require a name. It defines PII as a term that "includes information which identifies a person." *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *11 (N.D. Cal. Apr. 28, 2014).

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Zynga admits that "we share your information with . . . advertising service providers and third-party advertising partners," and that it "***has sold and/or shared*** unique identifiers, IP address, as well as Internet/Electronic Activity and Profile Inferences with third-party advertising providers to enable us to provide personalized advertising . . . . " FAC ¶ 114–115. Thus, "although the Privacy Policy does not explicitly say that it shares the relevant VPPA-PII combination with third parties, it does state that it discloses both categories of information." *See Campos*, 716 F. Supp. 3d at 639. And although Defendant cites authority for the proposing that anonymous identification data alone is not PII, those cases have no bearing here because Plaintiff does not allege that Zynga merely disclosed anonymous identification data.

**B. Defendant's conduct cannot be characterized as "order fulfillment" or "request processing."**

Defendant's attempt to spin its conduct as analogous to providing video "at the request of a player" for "order fulfillment" and "request processing" is meritless. As the FAC alleges, *Zynga* incentivizes players to watch the video advertisements. FAC ¶ 91–92. For instance, "when users run out of moves to beat a level, they can watch video advertisements to get additional moves. Users are also occasionally able to receive additional in-game items by watching video ads." FAC ¶ 92. It does this so that it can capture and sell their data, "so that Zynga could profit from selling targeted advertising." FAC ¶ 106. This has nothing in common with services that allow users to rent video because they watch them for entertainment value. Again, Defendant's assertion that its disclosures "to third party ad partners" are made "because a player *requested* an ad," MTD at 20 (emphasis original) ignores the FAC's actual allegations in favor of Defendant's preferred interpretations. Players do not "request" ads in any meaningful sense of the word. Zynga offers users incentives in order to get them to watch ads, so that Zynga can then make money selling their PII to third-parties.

**C. Plaintiffs are VPPA "consumers."**

A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 28 U.S.C. § 2710(a)(1). Plaintiffs are purchasers of goods and services from a video tape provider, namely Zynga. Defendant's deceptive sales tactics induced Plaintiffs to make multiple in-app purchases of Defendant's bundles, which contain various virtual goods or entertainment services.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Defendant argues that "players do not have to pay to play Toon Blast or to watch ads. Thus, Toon Blast players are not renters or purchasers of pre-recorded video content." MTD at 20. But the plain language of the VPPA does not require them to be "renters of purchasers of pre-recorded video content." Rather it defines them as "any renter, purchaser or subscriber of goods or services," which they are. As this Court has explained, "the definition of 'consumer' in the VPPA is not cabined to 'audio visual' goods and services, as Congress chose to omit an 'audio visual' clause from the consumer definition." *Ballard v. Insomniac Holdings, LLC*, 2025 WL 1696558, at *4 (N.D. Cal. June 17, 2025) (Illston, J.). Thus Plaintiffs, by making-in app purchasers, are "purchaser[s]" of Defendant's "goods or services"; it is irrelevant that they did not purchase any of Defendant's video ads. Since they are purchasers, Defendant's discussion of whether Plaintiffs are also subscribers is irrelevant.

**D. Defendant is a "video tape service provider."**

A "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Defendant is engaged in the business of delivering audio visual materials. In Zynga's own words: "Essentially, video is video, no matter where it appears. When it's within mobile games, it's a brand-safe space where advertisers can choose the genre and target the audience that best works for them." FAC ¶ 107.

The FAC alleges that "Zynga made ***$302.5 million*** in mobile game advertising revenue in 2020," and quotes Defendant's *own* statements that it "derive[s] a significant portion of our revenues from advertisements and offers that are incorporated into our free-to-play games through relationships with third parties" and even "maintains a website dedicated to promoting advertising to third parties, https://www.zyngaads.com/." FAC ¶¶ 95, 98–100. Defendant therefore cannot argue, especially at the motion to dismiss stage, that "delivering audiovisual content is 'not Defendant's particular field of endeavor.'" MTD at 21. On the contrary, the Court should credit Plaintiffs' allegations that the delivery of pre-recorded video content is part of the core product offered by Defendant. *See Ballard*, 2025 WL 1696558, at *3 (N.D. Cal. June 17, 2025) (Illston, J.) ("At this stage, defendant's argument raises a factual dispute into the role prerecorded video content

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 500 7th Ave., 8th Fl. New York, NY 10018 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

plays in its business model and is thus premature."); *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (Illston, J.) ("At the very least, Bleacher Report's argument that it is not a video tape service provider raises factual questions about the degree to which Bleacher Report's business model is tailored to delivery of audio visual materials. Accordingly, this argument is premature at the motion to dismiss stage.").

Further, Zynga's substantial revenue stream made from delivering audiovisual content has nothing in common with the video at issue in the cases it mistakenly relies on. For instance, in *Hernandez v. Chewy, Inc.*, 2023 WL 9319236, at *3 (C.D. Cal. Dec. 13, 2023) defendant was alleged to be an "online retailer of pet food and other pet-related products" that also "advertises video content on its website and encourages visitors to its website to watch the video content that Defendant hosts there." *Id*. The Court held that "[i]n Plaintiff's own words, the videos are aimed toward the sale of Defendant's pet products and are a marketing tool to promote Defendant's brand and website, nothing more." *Id*. Zynga, by contrast, delivers audiovisual content promoting other people's products and makes substantial money selling "targeted advertising" based on users PII.

**E. Plaintiff has standing to bring VPPA claims on a class-wide basis for Defendant's other mobile apps.**

Defendant contends that "Plaintiffs cannot represent a putative class of Zynga players other than those who played the same game that Plaintiffs did," relying on *Afriyie v. NBCUniversal Media, LLC*, 775 F. Supp. 3d 791 (S.D.N.Y. 2025). *See* MTD at 23. Defendant overstates *Afriyie*, which held on a motion to dismiss that the plaintiffs did not have class standing to assert claims based on other mobile applications. 775 F. Supp. at 801. There, the mobile apps were "alleged to transmit different types of information" than the apps the plaintiffs used. *Id.* As a result, the plaintiffs' claims "'could turn on very different proof'" and the plaintiffs "lack[ed] the 'right incentives' to develop arguments unique to the" the apps that plaintiffs did not issue. *See id.*

Here, however, there is nothing "unique" about Defendant's other games as regards to Plaintiffs' VPPA claims. In Defendant's own words, "85% of Zynga gamers enjoy in-game ads," and Zynga's video advertising remains central to Defendant's profit strategy. FAC ¶¶ 93-107. Zynga tracks and sells this data for targeted advertising to its partners. *Id.* ¶¶ 108-110. And Zynga's

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
500 7th Ave., 8th Fl. New York, NY 10018
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

privacy policy admits that Zynga shares a wide range of PII and a user's game activity with third parties. *Id.* ¶ 111-16. None of this is unique to the Games at issue. Rather, it is based on Zynga's widespread and common practices among its mobile applications and third-party advertisers. Moreover, Defendant's class-standing argument is "one more appropriate in the class certification stage of litigation, rather than a motion to dismiss." *John v. AM Retail Grp., Inc.*, 2018 WL 1400718, at *5 (S.D. Cal. Mar. 20, 2018) ("District courts in California routinely hold that the issue of whether a class representative 'may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.'"); *Minor v. Favorite World, LLC*, 2024 WL 4834951, at *3 (C.D. Cal. Sept. 17, 2024) ("[T]he Ninth Circuit has held that courts should apply the 'class certification approach,' not the 'standing approach,' when analyzing purported dissimilarities between class representatives and unnamed class members.").

**CONCLUSION**

For the above reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

DATED: November 4, 2025

Respectfully submitted,

By: /s/ *Raphael Janove*
Raphael Janove

**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
500 7th Avenue, 8th Fl.
New York, NY 10018
Telephone: (646) 347-3940

Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

*Attorneys for Plaintiffs and the Proposed Classes*